# UNITED STATES SMELTING, REFINING & M. CO. v. UTAH POWER & LIGHT CO. et al.

No. 3581.   Decided February 28, 1921.   Rehearing Denied May 6, 1921.   (197 Pac. 902.)

1   STATUTES—AMBIGUOUS WORDS SHOULD BE READ IN LIGHT OF CONDITIONS AND NECESSITIES THEY WERE INTENDED TO MEET AND PURPOSES SOUGHT TO BE ATTAINED.   When there is doubt regarding the true meaning of certain words in a statute, they should be read in the light of the conditions and necessities which they were intended to meet, and the purposes sought to be attained thereby.

2.   STATUTES—SENSE IN WHICH WORDS ARE INTENDED TO BE USED FURNISHES THE RULE OF INTERPRETATION AS COLLECTED FROM CONTEXT.   The sense in which general words, or any words, are intended to be used in a statute, furnishes the rule of interpretation, which is to be collected from the context, and a narrower or more extended meaning given according to the intention indicated.

3.   PUBLIC SERVICE COMMISSIONS—"ADEQUATE CONSIDERATION," AS USED IN ACT EXCEPTING CONTRACTS OF UTILITY PREVIOUSLY MADE, MEANS CONSIDERATION PREVENTING BENEFICIARY FROM RECEIVING PREFERENCES.   Under Comp. Laws 1917, § 4787, of the Public Utilities Act, providing that nothing in the act shall prevent the carrying out of contracts for public utility service, previously made, "founded upon adequate consideration," and lawful when made, by "adequate consideration" is meant such a consideration as, when all the elements which enter into the transaction are considered, would prevent the beneficiary under the contract from receiving a substantial preference or advantage over the public or other utility in the matter of rates or charges for the services rendered.

4.   ELECTRICITY—CONSIDERATION FOR FIXED RATE CONTRACT TO FURNISH CURRENT HELD NOT "ADEQUATE" WITHIN UTILITIES ACT.   Consideration paid a power and light company by a smelting company for contract to supply the smelting company with current at a fixed rate or price held not adequate within Comp. Laws 1917, § 4787, providing that nothing in the Public Utilities Act shall prevent the carrying out of contracts for free or reduced public utility service previously made founded on adequate consideration.

Certiorari.   Order Affirmed

5.  CONSTITUTIONAL LAW—REGULATION OF RATES FOR UTILITIES DOES
    NOT IMPAIR OBLIGATION OF CONTRACTS.  The regulation of rates
    for public utilities is a governmental function coming directly
    within the police power of the state, so that the establishing or
    modifying of rates though contractual does not violate the
    constitutional provisions against the passage of any law im-
    pairing the obligation of contracts (Const. Utah, art. 1, § 18;
    Const. U. S. art. 1, § 10).[1]

6.  PUBLIC SERVICE COMMISSIONS—STATE HAS NOT SURRENDERED
    RIGHT TO REGULATE RATE OF PUBLIC UTILITIES.  Neither the Utah
    Constitution nor any statute contains a surrender by the state
    of its right to regulate the rates of public utilities at any time,
    and there is no difference in respect of such regulation between
    rates fixed in so-called franchise ordinances and those fixed in
    ordinary contracts.

Application for writ of review by the United States Smelt-
ing, Refining & M. Company against the Utah Power & Light
Company and the Public Utilities Commission of Utah.

Order of the Utilities Commission sought to be reviewed
AFFIRMED.

*Howat, Marshall, Macmillan & Crow,* of Salt Lake City,
for plaintiffs U. S. Smelting, Refining & M. Co. and U. S.
Fuel Co.

*Dickson, Ellis, Lucas & Adamson,* of Salt Lake City, for
plaintiff Utah Copper Co.

*A. R. Barnes,* of Salt Lake City, for plaintiff Standard
Coal Co.

*H. H. Henderson,* of Ogden, for plaintiff Union Portland
Cement Co.

*Chas. Hollingsworth,* of Ogden, for plaintiff Ogden Port-
land Cement Co.

---

[1] *Salt Lake City* v. *Utah L. & Tr. Co.,* 52 Utah, 210, 173 Pac. 556,
3 A. L. R. 715.

*Geo. H. Smith, Jno. V. Lyle,* and *J. T. Hammond, Jr.,* all of Salt Lake City, for plaintiff Oregon Short Line R. Co.

*De Vine, Howell, Stine & Gwilliam,* of Ogden, for plaintiffs Utah-Idaho Cent. R. Co. and Bamberger Electric R. R.

*B. L. Liberman,* of Salt Lake City, for plaintiff Utah Steel Corporation.

*Rawlins, Ray & Rawlins,* of Salt Lake City, for plaintiffs Silver King Co. and Judge Mining & Smelting Co.

*Dey, Hoppaugh & Mark,* of Salt Lake City, for plaintiff Utah Metal & Tunnel Co.

*Van Cott, Riter & Farnsworth,* of Salt Lake City, for plaintiffs Salt Lake & U. R. Co., Salt Lake Terminal Co., Utah Hotel Co., and Deseret News.

*W. H. Folland,* City Atty., of Salt Lake City, for plaintiffs Salt Lake City and others.

*John F. MacLane* and *C. C. Parsons,* both of Salt Lake City, for defendant Utah Power & Light Co.

*H. Van Dan, Jr.,* Asst. Atty. Gen., for Public Utilities Commission.

FRICK, J.

The plaintiff above named has applied to this court for a writ pursuant to the provisions of what is known as the Public Utilities Act, now found in Comp. Laws Utah 1917, and constituting sections 4775-4853, inclusive, to review certain findings, orders and proceedings of the Public Utilities Commission of this state. In addition to this application 17 other applications were filed, all of which, including this one, were heard and submitted to this court at the same time. While all of the applications, to a large extent, involve the same

questions, and while the several applicants have on some phases presented the same arguments, yet in practically every application there are also some minor questions that are not common to all, and as to those separate arguments are presented. The principal or controlling question, which involves the construction of certain provisions of the Public Utilities Act of this state, is, however, involved in all of the applications. The applications will therefore be considered collectively except where the questions differentiate.

The plaintiff herein, hereinafter for convenience called smelting company, for a long time has owned and operated, and now owns and operates, a smelting plant in Salt Lake county. The Utah Power & Light Company, hereinafter designated power company, for some years has been, and now is, engaged in the business of generating and distributing to the public generally and to private corporations electric energy used for power and lighting purposes. The Public Utilities Commission, hereinafter called commission, is made a party to this proceeding merely because its findings, orders, and proceedings are assailed and are asked to be reviewed as will hereinafter appear.

The facts involved in this application, briefly stated, are as follows:

On June 2, 1915, the smelting company and the power company entered into a written contract wherein the latter contracted to supply the former, at a fixed rate or price, with all of the electrical energy by it required to operate its smelting plant for a stipulated term of years, which term has not yet expired. The electrical energy, for which the smelting company paid the rate agreed upon, was regularly supplied pursuant to the provisions of the contract entered into between the parties until the commission, made the order which is complained of in this proceeding and to which we shall refer later. On March 8, 1917, and after the contract before referred to was entered into between the smelting company and the power company, the Legislature of this state passed the Public Utilities Act, hereinafter referred to, merely as act or the act, creating the commission and conferring upon

it the powers and duties provided in said act. After the commission had been created and organized, the power company, as provided in the act, filed with the commission certain schedules of rates and charges for supplying electrical energy, including the terms and conditions upon which the power company would supply power and light to the public. The power company also filed with the commission the contract entered into between the smelting company and the power company, and also the contracts the power company had theretofore entered into with other users of its electrical energy for power and other purposes. In September, 1919, pursuant to the act, the commission made an order in which it was stated that the rates fixed in the contracts filed with the commission as aforesaid were not in harmony with the general rates charged by the power company, and that such rates were preferential and discriminatory and in violation of the provisions of the act. The commission also made an order requiring all of the users of electrical energy under the contracts aforesaid to appear before the commission and show cause why the rates fixed in those contracts should not be held to be discriminatory and in contravention of the provisions of the act. Pursuant to that order a protracted hearing was had before the commission, at which the power company, upon the one hand, and all the other holders of contracts, upon the other, and perhaps others, produced a large mass of expert and other evidence in support of their respective contentions. After the hearing terminated the commission made its findings and conclusions as required by the act, which findings and conclusions, together with the record of the proceedings, have been certified to this court by the commission for review. It must suffice to state that the gist of the findings and conclusions of the commission is that the rates and charges for electrical energy as fixed in the contracts before referred to are discriminatory and in violation of the provisions of the act. The commission also made the following order:

"That the contracts under which the following consumers have hitherto received service be, and the same are hereby, modified to the extent that the rates, rules, and regulations prescribed in the

standard schedules of the power company now on file with the commission be, and they are hereby, applied to the service rendered to or for the said consumers, in lieu of the rates, rules, and regulations provided in the said contracts."

The rates referred to in the foregoing order, and which are ordered tentatively to supersede the contract rates, are considerably higher than were the contract rates.

One of the principal reasons urged why the foregoing order of the commission should not prevail is that the commission has exceeded its power or jurisdiction in making said order for the reason that the contract of the smelting company, as well as the contracts of the other applicants to which reference has been made herein, are excepted from the act. The provision upon which the smelting company specially relies is found in Comp. Laws Utah 1917, § 4787. It is there provided as follows:

"Nothing in this title [act] contained shall be construed to prohibit" common carriers from granting certain free services to their employés, etc.

The clause specially relied on then follows, and is in the words following:

"Nor to prevent the carrying out of contracts for free or reduced rate passenger transportation *or other public utility service heretofore made founded upon adequate consideration and lawful when made.*" (Italics ours.)

In view of the foregoing provisions counsel for the smelting company, as we understand them, contend: (1) That inasmuch as the contract between the smelting company and the power company was entered into before the act was passed, and in view that the contract is "founded upon an adequate consideration and [was] lawful when made," therefore said contract is excepted from the act, and the commission has no power over it; and (2) that in any event the commission would have no authority to interfere with the rights stipulated in the contract, since doing so would result in impairing the obligation of contracts, which is prohibited by our Constitution.

The commission, upon the evidence, found that the contract was not based upon an adequate consideration as contemplated by the act. Upon that subject the decision of the commission is as follows:

"The term 'adequate' as used in the exception clause would seem to imply a separate and additional consideration than the stipulated price to be paid for the service or commodity. It appears to the commission that, in the absence of a showing that as part of the contract price paid for the service there was actually passed from the consumer something of value to the power company in the giving of service to the public, there was no such special consideration as would make the reduced contract rate non-discriminatory. Something of value must be shown to have moved from the beneficiary of the reduced rate or free service to the utility rendering such service. In that event the company would have received something for which it should properly be charged. And, if the showing was that such thing of value actually did pass, the commission would then have to determine the amount of such value and apply it along with the rate fixed in the contract, and thereby ascertain whether or not the thing of value passed from the consumer to the power company justified in the whole or in part the reduced rate named in the contract."

The commission also held:

"That it has jurisdiction over rates, charges, facilities, and conditions of service in existing contracts under consideration in these proceedings and has authority to modify or change the same.

"After a full consideration of all material facts that may or do have any bearing upon these contracts, the commission finds that the contracts under which service is being given to the following consumers do not carry such special consideration as will entitle them to the service at other than standard schedule rates open to the public generally, as evidenced by the schedules of the power company on file with the commission: [Here follows a long list of companies, including the smelting company.]

"The standard schedules now on file with the commission applicable to each of the power users hereinbefore in this paragraph mentioned should be applied to the service rendered to said consumers in lieu of the rates and charges in effect under special contracts, service under said standard schedules to commence upon the effective date of this order, and to continue until changed by further order of the commission."

One of the questions that must be determined by this court, therefore, is what is meant by, or what is included in, the term "adequate consideration" as that term is used in the act.

Before entering upon a discussion of that question, it will be convenient for us to here refer to some of the provisions of the act.

Section 4788 reads as follows:

"Except as in this section otherwise provided, no public utility shall charge, demand, collect, or receive a greater or less or different compensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates, tolls, rentals, and charges applicable to such products or commodity or service as specified in its schedules on file and in effect at the time, nor shall any such public utility refund or remit, directly or indirectly, in any manner or by any device, any portion of the rates, tolls, rentals, and charges so specified, nor extend to any corporation or person any form of contract or agreement, or any rule or regulation, or any facility or privilege except such as are regularly and uniformly extended to all corporations and persons; provided, that the commission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility."

Section 4789 provides:

"No public utility shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage to any corporation or person, or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service. The commission shall have the power to determine any question of fact arising under this section."

Section 4798 is as follows:

"The commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, as defined in this title, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated, or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction."

The various provisions of the act have been considered by this court in the cases of *Salt Lake City* v. *Utah L. & Tr. Co.*, 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715, P. U. R. 1918F, 377; *Union Portland Cement Co.* v. *Public Utilities Comm.*, 56 Utah 175, 189 Pac. 593, and *Murray City* v. *Utah L. & Tr. Co.*, 56 Utah 437, 191 Pac. 421, to which cases we refer for a more detailed statement of the provisions of the act.

Proceeding now to a consideration of what contracts are excepted from the act, we are forced to the conclusion that

not all existing contracts were intended to be excepted, but only those which were "founded upon an adequate consideration." To determine just what is meant by that phrase is not entirely free from difficulty.

The act is a very comprehensive one, and, in adopting it, it was the evident purpose and intention of the Legislature to prevent, so far as possible, all preferences and discriminations by public utilities in their rates and charges for public service. In connection with that purpose it is also manifest that it was intended to prevent, so far as that could be done, injustice where contracts had been entered into before the passage of the act in which the rates and charges agreed upon were based upon such a consideration as would work an injustice if the rates were increased without in some way making proper allowances for the consideration upon which the rates agreed upon in the contract were based.

We find no difficulty in arriving at the foregoing conclusion; nor, as we understand counsel's arguments, is there much diversity of opinion with regard to the correctness of the foregoing propositions. There is great diversity of opinion, however, with respect to what constitutes an adequate consideration within the purview of the act. It is strenuously insisted by counsel for the smelting company that by the phrase "adequate consideration" is meant such consideration as by text-writers and courts of equity, in equity proceedings, has always ben considered adequate when the question of adequacy of consideration was invoked in such proceedings. In other words, it is contended that the term "adequate consideration," as used in the act, must be construed to mean what that term has always been held to mean in the enforcement of contracts. While there is much force to the contention, yet, in view of all the facts and circumstances, it is far from being conclusive. As before pointed out, the act is intended to accomplish certain specific purposes, therefore all of its provisions, so far as consistent with the rules of construction, must be construed and applied in harmony with and in furtherance of those purposes. It is a well-recognized rule of interpretation that where there

is doubt respecting the true meaning of certain words then "the words should be read in the light of the conditions and necessities which they are intended to meet and the objects sought to be attained thereby." *Brummitt* v. *Waterworks Co.*, 33 Utah, 312, 93 Pac. 837, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828.   There is also another    1, 2 cardinal rule of interpretation to which courts in particular cases must have recourse which, by the author of Sutherland, Statutory Construction, in section 279, is stated thus:

"The sense in which general words, or any words, are intended to be used, furnishes the rule of interpretation, and this is to be collected from the context; and a narrower or more extended meaning will be given, according to the intention thus indicated."

For a proper application of the foregoing rule see *Plaster & Mfg. Co.* v. *Juab County*, 33 Utah, 114, 93 Pac. 53, 14 L. R. A. (N. S.) 1043. Moreover, where, as here, the question affects public interest and where the subject-matter of the contract in question comes squarely within the sphere of governmental functions, the foregoing rules of interpretation should, if necessary, be given full force and effect. Keeping in mind, therefore, that public interests as contradistinguished from merely private interests are sought to be protected, and that the dominating purpose of the act is to prevent preferences and discriminations respecting the rates charged or received by public utilities for services rendered or received, we think that the term "adequate consideration," as used in the act, must receive a broader meaning than would ordinarily be given to it in cases where merely rights as between parties to a private contract were in question.   Under the circumstances just stated, the rule that would ordinarily be held to apply as between parties to a private contract, when the adequacy of consideration to support or to enforce such contract in equity is involved, can therefore not be given unlimited application.   In view of the foregoing, in our judgment, by the term "adequate consideration," as used in the act, is meant a consideration such as would prevent the utility or person receiving the so-called

free, or the reduced, rate under an existing contract from receiving a preferential or discriminatory rate, and for which service the public or some other utility would be required to pay a higher rate. In other words, by adequate consideration is meant such a consideration as when all the elements which enter into the transaction are considered would prevent the beneficiary under the contract from receiving a substantial preference or advantage over the public or other utility in the matter of rates or charges for the          3
services rendered. To illustrate: If, for example, the power company had entered into a contract with some other utility to supply such utility with electric energy in consideration that such utility should pay a stipulated rate or charge for such service, and in view that the utility had advanced to the power company something which was of the reasonable value of $2,000, the rate had been reduced, say 40 per cent. below the ordinary rate, when in truth and in fact such reduction should have been, say, 20 per cent., in order to prevent the rate agreed upon from being a preferential and discriminatory one, then, and in such event, the consideration aforesaid of $2,000 would be inadequate to justify the commission in continuing the contract rate, and it should cancel it. This would be so for the reason that in continuing such a contract rate the commission would bring about the very result which was sought to be prevented by the act. That is, if the commission would continue in force the reduced rate specified in the contract, it would manifestly result in permitting a preferential and discriminatory rate to be continued in force, which would result in injustice to all other utilities, as well as to the public, who were required to pay the higher rate upon the one hand, while, upon the other, if the commission entirely ignored the consideration in the supposed case, and should enforce the established rate, which might be considerably higher, it would result in injustice and perhaps injury to the utility or person who had paid the consideration for the reduced rate. The commission is therefore given the power to so regulate existing contracts as to prevent all preferential rates upon the one hand

and injustice upon the other. By section 4788, supra, the commission may also regulate rates in all cases so as to prevent injustice. The exceptions in the statute are therefore intended to have application only so far as may be necessary to prevent preferential rates from being enforced on the one hand and from working an injustice upon the other.

In this connection it must be kept in mind that by the term "adequate consideration" the Legislature could not have intended to use that term as a quid pro quo in the sense that as between two parties to a contract the consideration passing to the utility for the service rendered should be equivalent in value to the cost of the service. With that feature the Legislature had no concern, nor any right to interfere, unless such interference were necessary in the public interest. A utility, in the absence of a law regulating the service in the public interest, may sell or dispose of its property, product, or service at such a price and upon such terms as it may choose, the same as any one else, and the Legislature, except in its governmental capacity, cannot, unless it be for the public good, interfere with that right. The utility may also sell its service at any price even though it should sustain a loss. When, however, the statute, in the interest of the public, steps in, then it must sell its service at the same rate to all, and if it has contracted to sell such service for a less price to one than it does to another, such a contract may then be held to be preferential and discriminatory.

By "adequate consideration," therefore, as that term is used in the act, is meant such a consideration as when added to or considered in connection with the reduced rate agreed upon will make such rate nonpreferential and nondiscriminatory, by reason of the fact that the additional consideration paid and received will prevent the reduced rate from being preferential, in that the contract, within the purview of the act is then "founded upon an adequate consideration." Where, under such circumstances, therefore, a reduced rate is contracted for and allowed, neither the public nor any other utility can complain, for the simple reason that there is in fact no preference or discrimination. When we con-

sider all of the provisions of the act, and keep in mind that free as well as reduced rate service is provided for, we can see no escape from the foregoing conclusions. How would it be possible, under the provisions of the act, to sustain a contract for free service? If a contract for free service cannot be sustained, because it would be preferential, then one for a reduced rate service cannot be sustained. What would be an adequate consideration to support a contract for "free" service under the act? Manifestly, such a consideration as would prevent the rate agreed upon from being preferential and discriminatory. To do that the consideration would have to be such as would at least approximate, if not equal, the amount that would have to be paid for the service under the usual and ordinary rate. It could be nothing less, and yet not be discriminatory or preferential. To my mind it is utterly inconceivable why the adjective "adequate" was used in the act if it was not used in the sense hereinbefore indicated. If the word had reference merely to adequacy of consideration as between the parties to the contrat, then it is entirely without force or effect. As between the parties the agreement on the part of the power company to supply electrical energy at a stipulated rate or price and the promise on the part of the smelting company to take the energy and to pay therefor the price agreed upon certainly was an adequate consideration to sustain the contract anywhere and in any court, either of law or equity, without anything more. Why, then, speak of an adequate consideration. The only reason for using that term in the statute was that a contract, in order to come within the exception, had to be founded upon such a consideration as would require the smelting company to pay, approximately at least, the same rate as the public or any other utility was required to pay for electrical energy which was being used under similar circumstances. The purpose of using the term was to protect the public as well as other public utilities from being discriminated against by having to pay a higher rate for electrical energy than those who are paying for the same energy under contracts. If, therefore, the consid-

eration passing from the contract holder to the power com-
pany was approximately sufficient to prevent the contract
rate from being preferential and discriminatory, then such
consideration was an adequate consideration within the con-
templation of the act; otherwise not.  By what we have said
we do not mean that the adequacy of the consideration can
be ascertained as though it were weighed in the scales of an
assayer or an apothecary, but what we do mean is that by
adequate consideration is meant such a consideration for the
service as will clearly prevent the rate agreed upon in the
contract from being preferential or discriminatory.  We are
also of the opinion that in determining whether a contract
in which a specific rate is agreed upon is founded upon an
adequate consideration or not the commission must take into
consideration all of the facts and circumstances and all of
the matters which have a direct relation to the subject-mat-
ter, and from all of those things determine whether the con-
tract in which a reduced rate is agreed upon is founded upon
an adequate consideration, and whether the reduced rate
agreed upon is or if it should be continued in force will be
or become preferential and discriminatory.  If, after a con-
sideration of the foregoing elements a rate, if continued,
would be preferential and discriminatory, then, in our judg-
ment, the commission should find that the contract fixing
such rate is not founded upon an adequate consideration
within the purview of the act, and the rate agreed upon
should be modified so as to prevent it from being preferen-
tial and discriminatory.  It needs no argument to demon-
strate that whether a rate is founded upon an adequate
consideration and is preferential and discriminatory or not
is, to say the least, a mixed question of law and fact, and,
in most instances, principally one of fact, and must there-
fore be determined by the commission from all the facts
and circumstances as before indicated.

Without now pausing to go into the evidence it must suffice
to say that the consideration for the rate agreed upon in the
contract in question in this proceeding does not measure up
to the standard or rule we have just stated, and, there-

fore there was ample authority for the commission
to refuse to approve the rate agreed upon in said con-
tract.

In connection with the foregoing it is also made to ap-
pear that the contract rates are manifestly lower than the
regular rates. It is not disputed that the electric energy
sold by the power company under the special contracts in-
volved in the hearing to which we have referred amounted
to 78 per cent. of its total sales, while for this 78 per cent.
the special contractees paid only 39 per cent. of its total
earnings. In view of that it necessarily follows that the
public and other utilities must pay increased rates to main-
tain the service.

It is, however, also contended with much vigor that the
commission exceeded its authority in interfering with the
rate stipulated in the contract in question, for the reason
that in doing so it violated both the Constitution of this
state and the federal Constitution, both of which prohibit
the passage of any law "impairing the obligations of con-
tracts." Article 1, § 18, Utah, Constitution; article 1, § 10,
federal Constitution.

It has been held repeatedly, both by the Supreme Court
of the United States and the courts of last resort of many
of the states, including this court, that the regulation of
rates for public utilities is a governmental function coming
directly within the police power of the state, and that for
that reason the establishing or modifying of rates, although
contractual, does not violate the constitutional provi-
sion aforesaid. Among the numerous cases that could
be cited in support of the foregoing proposition we
shall refer only to the following: *Union Co.* v. *Georgia P. S.
Co.*, 248 U. S. 372, 39 Sup. Ct. 117, 63 L. Ed. 309, 9 A. L. R.
1420; *Pinney & Boyle Co.* v. *Los Angeles G. & E. Co.*, 168
Cal. 12, 141 Pac. 620, L. R. A. 1915C, 282, Ann. Cas. 1915D,
471; *Bolt & Nutt Co.* v. *Light & Power Co.*, 275 Mo. 529,
204 S. W. 1074; *Milwaukee Elec. Ry.* v. *Wisconsin R. R.
Com.*, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254; *State*
v. *Billings Gas Co.*, 55 Mont. 102, 173 Pac. 799; *City of*

*Pawhuska* v. *Pawhuska O. & G. Co.,* 64 Okl. 214, 166 Pac.
1058; *City of Woodburn* v. *Public Service Commission,* 82
Or. 114, 161 Pac. 391, L. R. A. 1917C, 98; *City of Hillsboro*
v. *Public Service Commission of Oregon,* 97 Or. 320, 187 Pac.
617, 192 Pac. 390; *Limoneira* v. *Railroad Commission,* 174
Cal. 232, 162 Pac. 1033; *Winfield* v. *Public Service Com-
mission,* 187 Ind. 53, 118 N. E. 531; *Chicago, R. I. & P. Ry.*
*Co.* v. *Taylor* (Okl.) 192 Pac. 349. The question was also
considered by this court in *Salt Lake City* v. *Utah L. & Tr.*
*Co.,* 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715, P. U. R.
1918-F, 377.

It is, however, insisted that the foregoing cases are not
controlling here for the reason that in those cases the con-
tracts in question were entered into after the utilities law
was passed, or that the cases emanated from states where
there were constitutional provisions authorizing the regula-
tion of rates, while in the instant case the contract in ques-
tion was entered into long before the act was passed. It is
therefore argued that in view that there was neither a statu-
tory regulation law nor a constitutional provision authoriz-
ing such regulation in force at the time the contract was
entered into, it was lawful when made and in view of that
the obligations thereby assumed cannot be changed without
impairing its obligations. While it is true that the contract
in question was entered into before the act was passed, and
equally true that in this state there is no constitutional pro-
vision expressly authorizing the Legislature to regulate rates
for a service such as is rendered by the power company, yet
it is beyond controversy that the right to regulate the rates
of public utilities always existed potentially, and that the
right could be exercised at any time the state, through its
agency, the Legislature, deemed it wise and proper so to do.
Where the right to exercise the police power exists we can
conceive of no valid reason why the state may not exercise
the right at any time, and that every contract concerning
rates for public utility service must conclusively be pre-
sumed to have been entered into in view of and subject to
that right. If that were not so, then a public utility could

enter into a long-term contract, say 50 years or longer, in which it was given a preferential or discriminatory rate, and it thereby not only could prevent any other similar utility to successfully compete with it, but it could successfully defy the sovereign state itself. Such, happily, is not the law.

In *Chicago, R. I. & P. Ry. Co.* v. *Taylor*, supra, it is said:

"It has been said that the 'police power is that inherent sovereignty which it is the right and duty of the government or its agents to exercise, whenever public policy [in a broad sense] demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires.' * * * The police power is an attribute of sovereignty, and exists *without reservations in the Constitution, being founded on the duty of the state to protect its citizens and provide for the safety and good order of society.*" (Italics ours.)

In the course of the opinion in the case referred to it is further said:

"As neither the state nor the municipality can surrender by contract the governmental power to guard the safety, morals, health, and good order of society, a contract purporting to do so is void ab initio, and, being void, it is impossible to speak of laws in conflict with its terms as impairing the obligations of a contract."

In the case of *Producers' Transp. Co.* v. *R. R. Comm.*, 251 U. S. 228, 40 Sup. Ct. 131, 64 L. Ed. 239, the Supreme Court of the United States, in considering the power of the state to interfere with existing contracts, in the course of the opinion, says:

"That some of the contracts before mentioned were entered into before the statute was adopted or the order made is not material. A common carrier cannot, by making contracts for future transportation or by mortgaging its property or pledging its income, prevent or postpone the exertion by the state of the power to regulate the carrier's rates and practices."

The right and duty of the state to regulate the rates of public utilities in the public interest is as much an attribute of sovereignty or of government as are the things enumerated in the excerpt above quoted from *Chicago, R. I. & P. Ry. Co.* v. *Taylor*, supra, and hence comes squarely within the principle there stated.

In *Winfield* v. *Public Service Comm.*, 187 Ind. 53, 118

N. E. 531, the Supreme Court of Indiana, in the course of the opinion, after stating that unless the state has clearly divested itself of the right to exercise the police power to regulate rates, held that the state may ''for the public good regulate the acts and conduct of the public service companies,'' and further said:

"Every charter granted by the state, and every franchise, whether granted by the state directly or by the municipality acting as agent of the state, is granted in view of the rules above stated, and especially in contemplation of the fact that unless the state has in the charter to the utility company, or in the authority to its agent, or by ratification, abandoned its power to so regulate, the state's power is by implication written into such contract; and therefore the state's act of regulation, within the limits above stated, is not an impairment of the contract, but rather an exercise of a right provided in the contract."

A large number of cases are cited.

The same thought is expressed in a different way by the Supreme Court of Oregon in *City of Woodburn* v. *Public Service Comm., etc.,* 28 Or. 114, 161 Pac. 391, L. R. A. 1917C, 98, as follows:

"If a telephone company's franchise from a city, limiting rates to be charged, is deemed a contract, the mere fact that it was made prior to the enactment of the Public Utility Act (Laws 1911, p. 483), and before the state attempted to regulate such rates, does not debar the state from increasing the rates as fixed in the franchise, because when the state exercises its police power it does not work any impairment of obligation of the contract; the possibility of the exercise of such power being an implied term of the contract."

It will be observed that in the foregoing case, although the contract was entered into before the law was passed, yet the Supreme Court of Oregon held that it made no difference. We remark that in the Constitution of Oregon is found a provision precisely like that in our Constitution respecting the impairment of the obligations of contracts. See article 1, § 21, Or. Const.

Nor is the contention that there is a difference between rates fixed in so-called franchise ordinances and those fixed in ordinary contracts tenable. Indeed, if there is any difference at all in that regard, it should be in favor of contracts entered into in such franchise ordinances. Franchise ordi-

nances, so far as contractual, are precisely like other con-
tracts. There is nothing in either our Constitution or any
statute whereby the state has surrendered its right to
regulate the rates of public utilities at any time.        6
There is therefore no basis for the foregoing conten-
tion, and in view of what has been said the Legislature was
clearly within its rights when it authorized the commission
to regulate the rates and charges of public utilities in ex-
isting contracts.

We remark that while in the cases we have quoted from, as
well as in many others, it seems to be assumed that the state
may surrender its sovereign or governmental right and power
to regulate rates, yet, in view that that question is not
directly involved now, we express no opinion upon it.

It is also contended that, although it be conceded that the
commission had the power to change the rate agreed upon in
the contract in question, yet, in case it did so, it had no
power to keep in force all other obligations of the contract
assumed by the smelting company. Whether in changing
the rates agreed upon in a contract the other provisions
thereof are affected, and, if so, to what extent, is not involved
in this proceeding, and upon that question we likewise ex-
press no opinion.

Nor is the question regarding the extent the rates should
be modified or increased, if at all, involved here. It may be,
as suggested by counsel, that the power company is demand-
ing a greater increase in rates than it is entitled to. That
question, however, is still pending before the commission,
and we must assume that the commission will not permit
the power company to impose upon the public by granting
it the right to charge and collect excessive rates, or rates
that are higher than will enable it to effectuate the purpose
for which it is created and to adequately serve the public.
Nor can we assume that the commission will permit the
power company to inflate the value of its properties with a
view of enabling its stockholders to realize large profits upon
their stock. All of these matters must be determined by the
commission, and in discharging its duties in that regard, in

view of the abnormal conditions existing, the greatest care must, and no doubt will, be exercised to prevent injury to the public or to the public utility.

The order of the commission is therefore not vulnerable to the objections urged against it, and should be affirmed. Such is the order.   Costs to be paid by the smelting company.

CORFMAN, C. J., and WEBER and THURMAN, JJ., concur.

GIDEON, J. (concurring).   I am aware that neither litigants nor members of the bar are much interested in the reasons that impel courts to arrive at results in any particular case or group of cases.   It is therefore with some reluctance that I essay to put in the form of an opinion the reasons why I concur in the result reached by the court in the opinion prepared by Mr. Justice FRICK.

I do not agree with the reasons given nor with the conclusions reached in the opinion respecting the meaning or intent of the Legislature by the adoption of the much discussed proviso or exception found in Comp. Laws Utah 1917, § 4787.

Three major propositions are involved in the record presented to the court in these proceedings:   (1) Has the Legislature, by a general enactment, power to authorize the Public Utilities Commission to investigate contracts made by the utility (power company) with consumers of electrical energy prior to the adoption of the Public Utilities Act, and to give the commission power to determine whether such contracts are discriminatory or preferential, and, if found to be such, to direct the consumer by order to pay additional consideration for such electrical energy?   (2) Assuming that the Legislature has such power, has it, in the act under consideration, granted such power to the commission, or has it not attempted to except such contracts from the jurisdiction of the commission?   (3) Assuming that the Legislature has such authority, and assuming further that by the provisions

of the Utilities Act it has delegated the power to fix rates to be charged by public utilities, does the effort (if such be the intent) to exempt the contracts existing at the date of the enactment of the act from the control of the commission conflict with the constitutional provision that all laws of a general nature must be uniform in their application?

1.   The recent decision of the United States Supreme Court and the opinion of this court in these cases necessitate an affirmative answer to the first query suggested.

2.   The proviso, or exception, found in Comp. Laws Utah 1917, § 4787, so far as material, is as follows:

"Nothing in this title contained shall be construed   *   *   * to prevent the carrying out of contracts for free or reduced rate passenger transportation or other public utility service heretofore made founded upon adequate consideration and lawful when made."

From the language of the proviso, it appears to be conclusive that the Legislature intended to withhold existing contracts from the control of the commission. I am assuming always in this discussion that such contracts were founded upon an adequate consideration and lawful when made.

The term "adequate consideration," when used by courts and text-writers, has a well-understood meaning. It may be said to have an "approved usage" in its application, and should be so construed, unless there is something in the context of the statute wherein it is found to compel a different construction.  Comp. Laws Utah 1917, § 5847; *Miles* v. *Wells,* 22 Utah, 55, 61 Pac. 569.  A contract founded upon an adequate consideration may be said to be such a contract as courts recognize as binding upon the parties.  I find nothing in the act to necessitate the construction of a legal fiction or the indulgence of an assumption that the Legislature intended something foreign to the usual and customarily accepted meaning of the language used.  The language is neither ambiguous nor uncertain.  It says "adequate consideration," not special consideration.  It is hardly conceivable that if the Legislature intended any other consideration than that understood by the commonly accepted meaning of the words used, it would not have employed some apt

word or phrase to clearly express that meaning. The discussions leading up to the recent enactment of the law, which are matters of common knowledge, as well as the almost universal opinion of the legal profession that this and similar contracts were protected by the provisions of the Constitution denying to the Legislature power to pass any laws impairing the obligations of contracts, are at least persuasive that the Legislature intended to exempt such contracts as plaintiff's from the jurisdiction of the commission. The Senate committee who considered and reported this bill included at least two attorneys of recognized ability and knowledge of the law. It is at least a reasonable inference, in my judgment, that if the members of the committee had in mind any other thought than that conveyed by the ordinarily accepted meaning of the words used, some way would have been suggested to express that meaning. Moreover, to give to the words ''adequate consideration'' a meaning other than that conveyed by their commonly accepted import, or to make them mean a special consideration, is to render the phrase meaningless. To illustrate: Let us suppose that the law had been enacted in its present exact language, except that this proviso had been omitted. Then let us assume further that the commission had made an investigation of the plaintiff's contract and other similar contracts, and had determined that plaintiff's contract was discriminatory or preferential, and directed the plaintiff to pay for the electrical energy received by it under a schedule prepared by the commission as governing such a consumer. Plaintiff, however, was able to convince the commission that at the date of the contract, or at any other time, it had given to the power company, the utility, a consideration that in value equaled the difference between the rate fixed in the schedule and the rate fixed in the contract. Does any one doubt that under such a state of fact the court would direct a fulfillment of the contract on the part of the power company without any additional compensation? I think not. In what way, then, has the proviso, as construed, added to or subtracted anything from the legal 'rights of the parties? It leaves them just where

they were, and would have been if the proviso had been omitted.

I cannot, therefore, indorse, the conclusion that the Legislature intended by the words "adequate consideration" a special consideration as determined by the commission and the decision of this court.

3. I am convinced, however, that the attempt of the Legislature to exempt existing contracts from the jurisdiction of the commission must be held to be nugatory, because otherwise it would result in preventing the equal operation of a law of a general nature. It is conceded in the argument that the law creating the Public Utilities Commission is comprehensive in its scope and has for its chief purpose the regulation of such industries as are serving the public, and to prevent discrimination or preferences by such industries. That intent is manifest, not only from the known object of the law, but from the express words set forth in section 4789 and other sections of the act. No one will seriously contend that if the Legislature had by express words undertaken to except certain consumers, or a designated class of consumers, from the jurisdiction of the commission, legislation of that sort would have been within its power. After all, is not that just the effect of the proviso? Admitting the power of the Legislature to enact a valid law respecting any subject, such admission carries with it the constitutional necessity on the part of the lawmaking body to make such law uniform in its application and operation. *Northern Pac. Ry. Co.* v. *North Dakota*, 236 U. S. 585, 35 Sup. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; *Lake Shore & Mich. Southern Ry. Co.* v. *Smith*, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. In the last case cited the court said:

"The question is presented in this case whether the Legislature of a state, having power to fix maximum rates, * * * has also the right, after having fixed a maximum rate for the transportation of passengers, to still further regulate their affairs and to discriminate and make an exception in favor of certain persons, and give to them a right of transportation for a less sum than the general rate provided by law. * * *

"It does not seem to us that this claim is well founded.  We cannot regard this exceptional legislation as the exercise of a lesser right which is included in the greater one to fix by statute maximum rates for railroad companies.  The latter is a power to make a general rule applicable in all cases and without discrimination in favor of or against any individual."

The legislative act creating the Public Utilities Commission, by unambiguous language, gave to the commission plenary power to regulate rates to be charged for services by a public utility.  In that regard it is general in its application.  If that proviso is to be given the effect such as in my judgment the Legislature intended, it would of necessity conflict with the principle of law announced in the above excerpt from the opinion of the Supreme Court of the United States.

## On Application for Rehearing.

FRICK, J.  An application for rehearing has been filed in the above-entitled case and also in the other 17 cases in which the decisions follow the decision in this case.

The only question presented by counsel which requires consideration on this application is whether, as counsel suggests, this court has, in its decision, approved the order of the Public Utilities Commission in which it required the Utah Copper Company and some of the other plaintiffs to pay the temporary rates fixed by the commission, which rates were in excess of the contract rates existing between the defendant Utah Power & Light Company and the several plaintiffs referred to.  That question was not, nor was it intended to be, decided in any of those cases.  As we viewed the matter, and as we now view it, that question was not involved in the proceedings, and hence was not decided.  The question of whether the rates fixed by the commission, and which it ordered the plaintiffs aforesaid to pay, were just and reasonable, or whether they apply to any one or more, or all, of the plaintiffs, or whether, under the circumstances, the commission had the power to make and enforce them, was not considered and not decided.

In view of that, the applications for rehearing should be and accordingly are, denied.

CORFMAN, C. J., and WEBER, GIDEON, and THURMAN, JJ., concur.