CASE 62—ACTION FOR BREACH OF CONTRACT.—NOV. 28.

# Newport News & M. V. Co. v. McDonald Brick Co.'s Assignee.

APPEAL FROM JEFFERSON CIRCUIT COURT, COMMON PLEAS DIVISION.

JUDGMENT FOR PLAINTIFF AND DEFENDANT APPEALS.    AFFIRMED.

CORPORATIONS—SERVICE OF PROCESS—MANAGING AGENT—CHANGE OF
LAW AFFECTING LEGALITY OF CONTRACT—MEASURE OF DAMAGES.

Held:   1. Where a foreign corporation had ceased to do business in
the State, an attorney who, as general counsel, had charge of
all the business of the company in the State, and who was its
only general officer in the State, was "the managing agent" of
the corporation, within the meaning of Civil Code Practice, sec-
tion 732, subsection 33, providing that "the managing agent" of
a corporation shall be deemed its "chief officer," for the pur-
pose of service of process, where the corporation has no one of
several other officers in the State.
2. Where a manufacturing company located its plant on a railroad
operated by a foreign corporation under a lease, in considera-
tion of the agreement of the lessee to give and maintain a cer-
tain rate on fuel and raw material shipped, a subsequent change
in the law whereby any corporation organized under the laws
of another State was prohibited from operating a railroad in
the State without first becoming "a body corporate under the
laws of this Commonwealth" did not relieve the lessee from
its contract obligation, as it might, though with some incon-
venience, have complied with the law and continued to operate
the road.
3. A railroad company is not relieved of its contract obligation to
give a shipper a certain rate, though the law is changed after
the contract is made so as to make it unlawful for the com-
pany to charge other shippers a higher rate for shorter dis-
tances in the same direction, as it is not the giving of the
lower rate, but the charging of the higher rate, which is de-
clared unlawful.
4. Where the shipper, instead of suing from time to time for the
difference between the contract rate and the freight charged on
material actually shipped, seeks to recover for the entire injury
in one action, the measure of damages is the diminution in

Newport News & M. V. Co. v. McDonald Brick Co.'s Assignee.

value of the manufacturing plant by reason of the carrier's refusal to maintain the contract rate; and this is true though the shipper has become insolvent.

ALEX. P. HUMPHREY AND WM. MARSHALL BULLITT, OF COUNSEL FOR APPELLANT.

The Fidelity Trust Co., as assignee of the McDonald Brick Co., sued the Newport News and Mississippi Valley Co. for alleged breach of contract, claiming $60,000 damages.

Summons was returned served on Holmes Cummins, its general attorney for the State of Kentucky.

A plea in abatement was duly filed averring "that said Holmes Cummins was not an officer or agent of this defendant, but has been in the employ of this defendant as its attorney, and representing it in its legal business, and not otherwise."

A demurrer was sustained to that plea. The first question is whether the lower court ever obtained jurisdiction over the person of the defendant by service of process on its attorney at law.

We insist that an original service of process on an attorney at law is not a proper service on a client.

1. The code does not contemplate that process may be served upon the attorney for a corporation. Code, sec. 51, subsecs. 1 and 2; sec. 117.

2. An attorney for a corporation is not its "managing agent" within the meaning of the Code. Taylor v. Granite St. Prov. Assn., 136 N. Y., 343; (32 N. E., 992), Am. & Eng. Ency., 117, 124, vol. 22; 3 Am. & Eng. Ency. (2d ed.), 323, 324; Atchison, &c., R. R. Co. v. Benton, 42 Kan., 707; 22 Pac., 698, 701; Stone v. Bank of Commerce, 174 U. S., 412; People v. Mayor, &c., of N. Y., 11 Abb. Pr., 66; Starr v. Hall, 87 N. C., 381; 1 Wait's Actions, 439; Bailey v. Buckland, 1 Exch., 1; Masterson v. Leclaire, 4 Minn., 108-163, 167; Reed v. Reed, 19 S. C., 548; Whitty v. Barker, 1 Root, 446 (Conn.); Wilson v. Martin, &c., Co., 149 Mass., 24; National Acc. Society v. Spiro, 164 U. S., 281; Wabash Western Ry. Co. v. Brown, 164 U. S., 271.

If, however, the jurisdiction be sustained, then we must consider the case on its merits.

## STATEMENT.

1. The appellant agreed with the appellee brick company, on September 19, 1890, to haul material and supplies for said company for twenty years at the following rates:

Coal, 3 cents per 100 pounds; terra cotta, 2 cents per 100

pounds; clay, 5 cents per 100 pounds; brick, $2.40 per car of 40,000 pounds.

2. The brick company agreed to establish its plant for the manufacture of brick, terra cotta, &c., on the line of appellant's road, and to continue the same for a term of not less than twenty years from said date.

The brick company has continuously lost money on its plant, and at the end of three and a half years wound up hopelessly insolvent, having sunk $70,000 in the venture. By reason of an act of the Kentucky Legislature requiring all foreign corporations to become Kentucky corporations, the appellant surrendered its lease of the railroad on July 31, 1893, and withdrew from the State.

The C. O. & S. W. R. R. Co., as owner, resumed the possession and operation of the railroad on August 1, 1893, and so continued until December 28, 1893, when, under foreclosure proceedings of a claim antedating the N. N. & M. V. Co. lease, the Federal Court appointed John Echols and St. John Boyle receivers of the whole property. The receivers refused to agree to be bound by the contract made with the brick company, and referred the matter to Mr. Dumbeck, but no change was made until April 14, 1894.

In the meantime, and a month before any change was made, the brick company made a general assignment for the benefit of creditors, having been insolvent for several years before.

The advance in rates made April 14, 1894, fixed same as follows: Coal, 4.2 cents per 100 pounds; terra cotta, 2 cents; clay, 5 cents; brick, 1¼ cents per 100 pounds, and $5.00 per car load of 40,000 pounds, the new rates to go into effect May 1, 1894.

On May 14, 1894, Mr. Dumbeck wrote to the brick company that he would lower the rates on coal to 60 cents per ton, the contract rate, and lower the rate on brick to $4.00 per car of 50,000 pounds.

### ARGUMENT.

Was the brick company damaged by that breach, and if so, what is the measure of damages? We submit that it was not damaged, and if so, the damages are so remote and speculative as not to be recoverable in an action at law.

### FIRST DEFENSE.

There was a clear departure between the cause of action set forth in the petition and the cause set out in the reply.

Newport News & M. V. Co. v. McDonald Brick Co.'s Assignee.

### SECOND DEFENSE.

There is no evidence to show that prior to the assignment of the McDonald Brick Company there was any announced intention to raise the rates.

### THIRD DEFENSE.

The insolvency of the brick company was not caused by the threatened raise in the rates.

### FOURTH DEFENSE.

The instructions in this case were clearly erroneous.

HARRIS & BARR, FOR APPELLEE.

### POINTS AND AUTHORITIES.

#### I.

##### THE PLEA IN ABATEMENT.

1. The plea is defective in not alleging that Holmes Cummins was a resident of Tennessee when the summons was served on him. Thompson v. Neal, 1 Dana, 468.
2. Service of summons is not governed by sections 51-4 of the Code, because appellant was not a common carrier when service was made.
3. Holmes Cummins, the "Chief Attorney" of appellant, was a managing agent within the meaning of the Code. Civil Code, 51-3, and 732-33; C. & O. R. R. v. Cowherd, 96 Ky., 119; Murfree on Foreign Corporations, sec. 215; Dock v. Elizabethtown, 5 Vroom, 318; Palmer v. Penna. Co., 35 Hun., 370; Estes v. Belgard, 22 Fed. Rep., 275; Norton v. Bridge Co., 51 N. J. L., 442; Wilson v. Wilson Co., 149 Mass., 26.
4. The petition and motion to transfer was an appearance. Porter v. R. R., 1 Neb., 18; 2 Enc. Pl. & Pr., 625.

#### II.

The act of July 12, 1893, did not compel appellant to leave the State or make its continuance here illegal. Unless that was the case it does not excuse appellant from performing its contract. 10 Am. & Eng. Ency., 182.

#### III.

Section 820 of the Kentucky Statutes does' not make it illegal to carry freights at lower rates than the usual tariff or at unremunerative rates.

IV.

There was no error in the rule of damages applied by the trial court. U. S. v. Behan, 110 U. S., 338; Henderson Bridge Co. v. O'Connor, 88 Ky., 302; Blue Grass Cordage Co. v. Lathy, 98 Ky., 583; Hutchinson on Carriers, sec. 773; note; Sedgwick on Damages, side page 112.

OPINION OF THE COURT BY JUDGE BURNAM—AFFIRMING.

This is an appeal from a judgment of the Jefferson Circuit Court rendered upon a verdict of a jury in favor of appellee against appellant. The facts out of which the litigation grew are best shown by the following correspondence between McDonald Bros. and the general freight agent of appellant, a corporation organized under the laws of Connecticut, and who were at that time operating a railroad, as lessees, upon the line of the Chesapeake, Ohio & Southwestern Railroad, in this State, between Louisville and Paducah, under a 50-year lease. The letter of McDonald is as follows: "Louisville, Ky., July 6, 1890. B. F. Mitchell, Esq., G. F. A., N. N. & M. V. R. R. City—Dear Sir: We desire to locate near Lockland, a station about six miles out on your road, a manufacturing establishment for the purpose of making brick and other clay products. It will be necessary, before locating there or purchasing the ground with a view to it, to know at what rate you will deliver brick to us at 14th and Kentucky streets and at 12th and Rowan; also, a rate on terra cotta and sewer pipes. We would also like to know what you will haul us coal for from the Kentucky coal field, say at Render, or some coal mines in Ohio or Muhlenberg counties. It will probably be necessary in our manufacture to use fire clay, which could be obtained certainly from Paducah, and possibly from points nearer, and a rate upon this will also be necessary. It will also be necessary to have assurance from you that the rate quoted will be a

continuous one, inasmuch as we expect to make a large
investment in the plant and land, which would be useless
to us unless we could rely on the rates given being main-
tained.   Please let all rates quoted include switch charges,
and quote them with the understanding that we would be
permitted to use your side tracks for loading and unload-
ing.   We call your attention to the desirability of making
a different rate for Fourteenth and Kentucky from that
at Twelfth and Rowan, as it will frequently occur that
for an increase of expenditure we can deliver our products
from Fourteenth and Kentucky instead of Twelfth and
Rowan, and therefore, if a sufficient difference is made,
a portion of the business need not come over Fourteenth
street at all.   It is possible that a company may be or-
ganized to operate this plant,and in quoting this rate please
arrange it so that we or our assigns may use the terms
given.   Please give us as favorable terms as you can, make
them permanent, and let me have your response as early
as you conveniently can.   Yours, respectfully, McDonald
Bros."   To which letter appellant responds:  "July 29th,
1890.   McDonald Bros., Louisville, Ky.—Gentlemen: Pro-
posed plant on N. N. & M. V. Co., W. D., at point between
Alms House and Lockland, Ky.   Referring to your favor
of the 26th instant, in consideration of your locating your
plant on the N. N. & M. V. Co., W. D., at a point between
Alms House station and Lockland station, we will make
you a rate upon coal from the mines upon our line to
Lockland, Ky., of 3c. per cwt.   On terra cotta and sewer
pipe from your location to Louisville, we will make you
a rate of 2c. per cwt. in car loads.   The rate on clay from
Paducah and points this side of Lockland, Ky., will be
5c. per cwt., in car loads.   Brick in car loads, 40,000 lbs.
and less, will be $2.40 per ton from Lockland to Louis-

ville.   The rate upon brick includes delivery at our local depot or at Fourteenth and Kentucky.   Kindly advise me if these rates are satisfactory, and oblige, yours, truly, [not signed] G. F. A."   After the receipt of this letter, McDonald Bros. organized a corporation with a paid-up capital of $50,000, purchased 138 acres of land near Lockland station, and erected buildings and machinery for the prosecution of their enterprise, expending therefor about $77,710.   The freight rates suggested in the letter of appellant were subsquently agreed on and closed by a contract, which was signed by the McDonald Brick Company and John Echols, third vice president of appellant company.   Appellee began business in December, 1890, and freights were carried under the contract of appellant until the 31st day of July, 1893; appellee paying to appellant during this interval more than $15,000 for freight transported under the contract.   In July, 1893, the appellant company, without notice to appellee, voluntarily surrendered its lease and ceased to do business in this State. The operation of the railroad was resumed by the Chesapeake, Ohio & Southwestern Railroad; the same rate being charged until January 1, 1894, when receivers were appointed by the United States Circuit Court for the district of Kentucky to take charge of the line; John Echols, third vice president of appellant company, being one of the receivers.   A short time thereafter appellee brought to the attention of the receivers the contract for freight under which their plant was erected, and insisted upon its being literally carried out, representing to the receivers that the brick company would be unable to continue business if any change was made, increasing the amount charged them for freight.   This the receivers refused to do, upon the ground that it was a losing contract to the

company, and that they were not bound by the agreement of appellant company. After this refusal on the part of the receivers of the railroad company to continue the freight contract, the brick company made a general assignment for the benefit of their creditors to the appellee trust company, and the plant was sold by the assignee for $10, subject to mortgages of $16,886.10; and this action for breach of contract was thereupon instituted, and resulted in the verdict and judgment complained of. A number of alleged errors are relied on for reversal.

First, it is insisted that the trial court acquired no jurisdiction of the person of the defendant by the service of the process issued thereon upon Holmes Cummings, who was only in the employ of appellant as its attorney; these facts being pleaded in abatement, and the court asked to quash the service. Sub-section 3 of section 51 of the Civil Code of Practice provides that in an action against a private corporation the summons may be served in any county upon the defendant's chief officer or agent who may be found in this State. And sub-section 33 of section 732 provides that the chief officer of a corporation which has any of the officers or agents herein mentioned is (1) its president; (2) its vice president; (3) its secretary or librarian; (4) its cashier or treasurer; (5) its clerk; (6) its managing agent. It is conceded that appellant did not have in this State either of the first five officers designated in the section. And this question must therefore be decided by determining whether Holmes Cummings, the person on whom the process was served, was "the managing agent" of appellant company at the time the summons was served upon him, within the meaning of the provision of the Code quoted above. It is insisted by appellant that he was its attorney, representing it alone

in this capacity, and that he was in no sense its managing agent. When interrogated upon this point, Mr. Cummings testified that he had charge, as general counsel, of all the business of appellant in Kentucky and Tennessee; that all of the papers involving the rights of the company were referred to him; and that the company had no other general officer in this State. And the plea in abatement filed by appellant was signed by P. H. Darby, alone, as attorney, but was signed and sworn to by Holmes Cummings. It is the policy in this State that foreign corporations doing business within the State shall always be amenable to the process of its courts, and, to this end, process is generally allowed to be served upon agents, in the absence of higher officers. "If the person served sustains sufficient character and rank to render it reasonably certain that the corporation would be apprised of the service, the requirement of the statute is answered." See Murfree, Foreign Corp., section 215. Appellant had ceased to do business as a common carrier in this State, and the only business it was conducting was the winding-up of the matters which grew out of the lease, and this was such as necessarily required the attention of a professional lawyer; and, as appellant had no other agent looking after these important matters, we think the trial court properly concluded that Mr. Cummings was its managing agent, in the meaning of the Code, and the service of process upon him was sufficient to give jurisdiction. It is therefore necessary that we should consider the other grounds relied on for reversal.

The answer of appellant first denied all of the affirmative averments of appellees' petition on which they relied for recovery. In the third paragraph of their answer they say "that the rates named in the contract to the"

McDonald Brick Company "for the transportation of freight for it were very much lower than the regular rates prescribed by their tariff, and charged by them for the transportation of similar products for shorter distances in the same direction over their railroad, under substantially similar circumstances and conditions; that said rates so fixed by its tariff are just and necessary for the successful operation of the road, special rates having been given to the McDonald Brick Company solely to assist it in establishing its business, but after the contract was made on the 20th day of September, 1891, the State of Kentucky by the adoption of its present Constitution, and afterwards by legislative enactments in conformity thereto, made such special rates unlawful." In the fourth paragraph, for their answer, they plead that they were organized under the laws of the State of Connecticut, and were so at the time of the making of their contract for the operation of the Chesapeake, Ohio & Southwestern Railroad under a lease for fifty years, which began February 1, 1886; that after said contract was made, to-wit, on the 12th day of July, 1893, the State of Kentucky enacted a law which by its terms prohibited corporations organized under the laws of other States or countries than this State from controlling, maintaining or operating a railroad herein after the 1st day of August, 1893, under heavy penalties; and that by reason of this statute they were compelled to surrender their lease, as it became from and after that date unlawful and void. They further allege that the McDonald Brick Company became insolvent before there was any change made in the charges to them for the transportation of their freight, and that the assignment was not caused by threats of a raise in the rates;

and, last, that the court erred in the instructions given to the jury.

Section 211 of our present Constitution prohibits a railroad corporation organized under the laws of other States or of the United States, and doing business or proposing to do business in this State, from acquiring or operating railroads herein until it shall have become a body corporate under the laws of this Commonwealth; and section 841 of the Kentucky Statutes was passed pursuant to this requirement of the Constitution. It provides that any such corporation may become a Kentucky corporation by filing in the office of the Secretary of State and in the office of the Railroad Commission a copy of the charter or articles of incorporation of such company, properly authenticated. The provisions of the statute could have been easily complied with, and certainly can not be invoked to release appellant from a plain contract liability; and the same may be said of section 218 of the Constitution, and of section 820 of the Kentucky Statutes passed pursuant thereto, regulating freight rates to be charged by railroad companies for long and short hauls over their roads under substantially similar circumstances and conditions. The statute does not punish the giving of the lower rate, but forbids the charging of a greater compensation in the aggregate for the transportation of passengers or property of like kind under substantially similar circumstances and conditions for shorter than for the longer haul. The effect of changes in the statutes upon the rights of parties under existing contracts is clearly stated in 10 Am. & Eng. Enc. Law (1st Ed.) p. 182. It is as follows: "If subsequently to the making of contracts a statute is enacted which makes the performance of the contract unlawful, a legal impossibility supervenes,

which releases the promisor from his obligation; but, if the performance of the obligation is rendered merely more burdensome or expensive, the enactment of the statute creates no such impossibility as will excuse the obligor." It is apparent that by this change in the organic and statutory law either appellant or appellee was bound to suffer, but there is nothing in either provision which makes the performance of the contract a legal impossibility. It is true that its performance is rendered more burdensome and expensive to appellant, but this does not result from any failure or nonperformance on the part of appellees of their part of the agreement. We do not, therefore, think that the trial judge erred in sustaining a demurrer to these paragraphs of the answer.

The last ground of complaint is that the court erred in defining the measure of damages. In its instructions on this point the court told the jury "to find for the plaintiff in such a sum as they may believe from the evidence plaintiff's plant for making brick was diminished in value by reason of defendants' refusal to perform their contract." It is insisted by appellant that the plant was not injured by the raising of the rates, and that the only way in which the McDonald Brick Company could be damaged by the raising of the rates was by having to pay more therefor, and that such damages would depend entirely upon the amount of freight transported, and that its only remedy is a claim for the difference between the freight rate contracted for and the freight charged on the material actually transported, and that such right of action would accrue to appellee from time to time as the contract was violated in this respect. Undoubtedly the brick company could have pursued the remedy suggested by appellant, but it was not its only remedy, and in this instance would

have proved inadequate to compensate for the wrong complained of. Appellant, in order to build up an extensive manufacturing establishment on its line guaranteed to appellee a low scale of rates. After the acceptance of the guaranty, the erection of the proposed plant, and the expenditure of large sums of money for this purpose, appellant can not abandon the contract, which constitutes an important consideration for such expenditures by appellee, without laying itself liable for the damages occasioned thereby to the plant. As was stated by Justice Bradley in the case of U. S. v. Behan, 110 U. S., 345, (4 Sup. Ct., 84), (28 L. Ed., 170): "When a party injured by a stoppage of a contract elects to rescind it, then, it is true, he can not recover any damages for breach of the contract, either for outlay or for loss of profits. There is then no question of losses or profits. But, when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is the amount he has been induced to spend on the faith of the contract, including a fair allowance for his own time and services. If he chooses to go further, and claims for the loss of anticipated profits, he may do so, subject to the rules of law as to the character of the profits which may thus be claimed. It does not lie, however, in the mouth of the party who has voluntarily and wrongfully put an end to the contract, to say that the injured party has not been damaged, at least to the amount of what he has been induced fairly and in good faith to lay out and expend." And the same rule of law was duly adhered to by this court in the case of Bridge Co. v. O'Connor, 88 Ky., 303, (11 S. W., 957), and in Cordage Co. v. Luthy, 98 Ky., 583, (33 S. W., 835). It is also insisted by appellant that the brick company was not damaged because the rates were not raised until after it be-

came insolvent. . No damages were asked or allowed by the instructions on account of prospective profits, or by reason of insolvency of appellee, which it was averred grew out of the refusal of appellant to keep its contract. The loss is limited by the instructions to the diminution of the value of the plant. It would have been just as much damaged if the company had been solvent and prosperous. Upon the whole case, we think there has been no error prejudicial to the rights of appellant. Judgment affirmed.

Judge Hobson not sitting.