# UTAH COPPER CO. v. PUBLIC UTILITIES COMMISSION OF UTAH et al.

No. 3659.   Decided December 15, 1921.   (203 Pac. 627.)

1. ELECTRICITY—PUBLIC UTILITIES COMMISSION PROPERLY REFUSED TO PASS UPON REASONABLENESS OF RATES IN PROCEEDING INVOLVING ISSUE AS TO WHETHER RATE CHARGED PARTICULAR CONSUMER WAS DISCRIMINATORY.   Where proceeding before Public Utilities Commission, involving issue as to whether rates at which power company was furnishing power to particular consumer was discriminatory, in violation of Comp. Laws 1917, § 4789, was held concurrently with proceeding on power company's application to increase its rates, the Commission properly refused, in the first proceeding, to pass upon the reasonableness of the rates sought to be charged by the power company, or to pass upon the reasonableness of the rates being charged by the company according to its regular schedule, at which the company was ordered to supply power to consumer to whom power had previously been furnished at discriminatory rate.

2. ELECTRICITY—PUBLIC UTILITIES COMMISSION'S ORDER ON RATE CHARGED PARTICULAR CONSUMER HELD NOT RES ADJUDICATA AS TO REASONABLENESS OF RATES OR POWER TO FIX TEMPORARY RATES.   Public Utilities Commission's order that rate at which electricity was being furnished to particular consumer was discriminatory and preferential in violation of Comp. Laws 1917, § 4789, and that power should be furnished such consumer at the prevailing regular schedule rate, made in proceeding in which the Commission refused to express an opinion as to the reasonableness of such rates, and as to the power of the Commission to fix and enforce temporary rates, pending other hearing before the commission on the power company's application to increase its rates, *held* not res adjudicata as to the reason-

ableness of such rates or the power of the Commission to fix and enforce such temporary rates.

3.  PUBLIC SERVICE COMMISSIONS—PUBLIC UTILITIES COMMISSION EM-POWERED TO FIX RATES REGARDLESS OF CONTRACTUAL RELATIONS. Under Public Utilities Act (Comp. Laws 1917, § 4784, subd. 2, sections 4785, 4788, 4789, 4798, 4800, and section 4830, subds. 1 and 2), and in view of the Constitution, the Public Utilities Commission has power to regulate the public utilities of the state, and fix the rates to be charged the public in accordance with the act, regardless of contractual relations.[1]

4.  CORPORATIONS—POLICE POWER TO REGULATE PUBLIC UTILITIES BASED ON RIGHT TO SECURE JUST RATES TO CONSUMING PUBLIC. Fundamentally, the legislative or police power to regulate the public utilities of the state and fix rates rests on the legal right to secure to the consuming public just, uniform, and equitable rights, as applied to the service rendered.

5.  CORPORATIONS—SERVING UTILITIES ENTITLED TO FAIR RETURN, UNDER PUBLIC UTILITIES ACT. The Public Utilities Act contem-plates that the serving utilities, burdened as they are, and as they should be, with the duty of rendering efficient service to the public, are entitled to earn a fair return or income from the property used in successful and economical operation.

6.  ELECTRICITY—PUBLIC UTILITIES COMMISSION, ON FINDING CON-TRACT RATE DISCRIMINATORY, COULD ORDER CONSUMER TO PAY SCHEDULE RATE PENDING DECISION AS TO REASONABLENESS. Where hearing before Public Utilities Commission, involving question as to whether rate charged particular consumer under a con-tract was discriminatory and preferential in violation of Comp. Laws 1917, § 4789, was being held concurrently with hearing on application of the power company to increase its rates, the Com-mission, on finding the contract rate to be discriminatory, before making its order as to a reasonable rate in the other proceeding, had power to fix, as a temporary rate at which such consumer was to be furnished power, pending decision as to the reasonable rate in the other proceeding, the regular schedule rate at which power was being furnished to other consumers, without passing on the reasonableness of such tem-porary rate, with the proviso that, if such temporary rate was

---

[1] *Salt Lake City* v. *Utah L. & T. Co.*, 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715; *Union Portland Cement Co.* v. *Public Utilities Com.*, 56 Utah, 175, 189 Pac. 593; *Murray City* v. *Utah L. & T. Co.*, 56 Utah, 437, 191 Pac. 421; *U. S. Smelting, Refining & Milling Co.* v. *Utah Power & Light Co.*, 58 Utah, 168, 197 Pac. 902.

Certiorari. Orders affirmed

ultimately found excessive, the power company should make reparation.

7. PUBLIC SERVICE COMMISSIONS—SUPREME COURT CANNOT INTERFERE ON CERTIORARI UNLESS RATE ESTABLISHED IS CLEARLY UNJUST OR CONFISCATORY. Under Public Utilities Act (Comp. St. 1917, § 4834), and Const. art. 1, § 11, the Public Utilities Commission is peculiarly an administrative body, clothed by the Legislature with the power to regulate the public utilities of the state, and the Supreme Court, on certiorari to review the Commission's order has no right to interfere unless it clearly appears that the rates as established by the Commission are manifestly unjust or confiscatory in their nature, or that the Commission has acted outside its powers.[2]

GIDEON and WEBER, JJ., dissenting in part.

Certiorari by the Utah Copper Company to review an order of the Public Utilities Commission of Utah in the matter of the application of the Utah Power & Light Company for permission to increase its power rates under the Public Utilities Act.

Orders and rulings of Commission AFFIRMED.

*R. G. Lucas,* of Salt Lake City, for plaintiff.

*H. H. Cluff,* Atty. Gen., and *John F. MacLane* and *C. C. Parsons,* both of Salt Lake City, for defendants.

CORFMAN, C. J.

This case is brought here by the plaintiff on a writ of certiorari to review an order of the Public Utilities Commission of Utah made and entered on the 8th day of March, 1921, in the matter of the application of the defendant Utah Power & Light Company for permission to increase its power rates, under the provisions of title 91, Comp. Laws Utah 1917, commonly known and referred to as the Public Utilities Act.

[2] *Salt Lake City* v. *Utah L. & T. Co.,* 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715.

For convenience, hereinafter the plaintiff will be referred to as the "Copper Company," and the defendants, respectively, as the "Commission" and the "Power Company," while the statute bearing on the questions involved will be referred to as the "Utilities Act."

It appears that the Copper Company is engaged in the business of mining and reduction of ores upon an extensive scale in this state, and that the Power Company is engaged in generating hydroelectric energy and furnishing the same to its consumers for heating, lighting, and power purposes. The latters owns and operates some 25 hydroelectric plants on the Bear river in Utah and Idaho. All of its plants are interconnected, and upon its power system approximately 80 per cent. of the population of Utah is dependent for electrical service, industrially and otherwise.

The evidence discloses that initial cost, exclusive of overhead expenses, water rights, and intangible values, of the various power plants owned by the Power Company in Utah and Idaho, represents expenditures made on the part of the Power Company and its predecessor companies of about $42,000,000. The Power Company was created a corporation under the laws of the state of Maine in 1912. It began its actual business operations in this state January 1, 1913, and about that time it entered into a 25-year contract with the Copper Company to furnish the latter, for its operations in the mining and reduction of ores, 31,000 horsepower of hydroelectric energy, at a base rate of 4,208 mills per k. w. h. upon conditions therein named. Our Legislature passed the Utilities Act in 1917. Said act, among other things, provides:

Section 4798: "The Commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, as defined in this title, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated, or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction."

Subdivision 2 of section 4784: "Under such rules and regulations as the commission may prescribe, every public utility other than a common carrier shall file with the Commission within

such time and in such form as the Commission may designate, and shall print and keep open to public inspection schedules showing all rates, tolls, rentals, charges, and classifications collected or enforced, or to be collected or enforced, together with all rules, regulations, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, charges, classifications, or service. Nothing in this section contained shall prevent the Commission from approving or fixing rates, tolls, rentals or charges, from time to time, in excess of or less than those shown by said schedule."

Section 4785: "Unless the Commission otherwise orders, no change shall be made by any public utility in any rate, fare, toll, rental, charge, or classification, or in any rule, regulation, or contract relating to or affecting any rate, toll, fare, rental, charge, classification, or service, or in any privilege or facility, except after thirty days' notice to the Commission and to the public as herein provided. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force, and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes without requiring thirty days' notice herein provided for, by an order specifying the changes so to be made and the time when they shall take effect, and the manner in which they shall be filed and published. When any change is proposed in any rate, fare, toll, rental, charge, or classification, or in any form of contract or agreement, or in any rule, regulation, or contract relating to or affecting any rate, toll, fare, rental, charge, classification, or service, or in any privilege or facility, attention shall be directed to such change on the schedule filed with the Commission, by some character to be designated by the Commission, immediately preceding or following the item."

Section 4788: "Except as in this section otherwise provided, no public utility shall charge * * * less or different compensation * * * for any service rendered * * * than the rates * * * applicable to such * * * service as specified in its schedules on file and in effect at the time, nor shall any such public utility * * * extend to any corporation or person any form of contract or agreement * * * except such as are regularly and uniformly extended to all corporations and persons; provided, that the Commission may by rule or order establish such exceptions from the operation of this prohibition as it may consider just and reasonable as to each public utility."

Section 4789: "No public utility shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage. * * *"

Section 4800: "Whenever the Commission shall find after hearing that the rates * * * collected by any public utility * * * or that the * * * practices, or contracts * * * affecting such rates * * * are unjust, unreasonable, discriminatory, or preferential, or in any wise in violation of any provisions of law, or that such rates, fares, tolls, rentals, charges, or classifications are insufficient, the Commission shall determine the just, reasonable, or sufficient rates, * * * rules, regulations, practices, or contracts to be thereafter observed and in force, and shall fix the same by order as hereinafter provided."

Section 4830: "1. No public utility shall raise any rate, fare, toll, rental, or charge or so alter any classification, contract, practice, rule, or regulation as to result in an increase in any rate, fare, toll, rental, or charge, under any circumstances whatsover, except upon a showing before the Commission and a finding by the Commission that such increase is justified.

"2. Whenever there shall be filed with the Commission any schedule stating an individual or joint rate, fare, toll, rental, charge, classification, contract, practice, rule, or regulation increasing or resulting in any increase in any rate, fare, toll, rental, or charge, the Commission shall have power, and it is hereby given authority either upon complaint or upon its own initiative without complaint at once and if it so orders without answer or other formal pleadings by the interested public utility or utilities, but upon reasonable notice, to enter upon a hearing concerning the propriety of such rate, fare, toll, rental, charge, classification, contract, practice, rule, or regulation, and pending the hearing and the decision thereon, such rate, fare, toll, rental, charge, classification, contract, practice, rule, or regulation shall not go into effect; provided that the period of suspension of such rate, fare, toll, rental, charge, classification, contract, practice, rule, or regulation shall not extend beyond 120 days beyond the time when such rate, fare, toll, rental, charge, classification, contract, practice, rule, or regulation would otherwise go into effect unless the Commission, in its discretion, extends the period of suspension for a further period not exceeding six months. On such hearing the Commission shall establish the rates, fares, tolls, rentals, charges, classifications, contracts, practices, rules, or regulations proposed, in whole or in part or others in lieu thereof, which it shall find to be just and reasonable. * * *"

On April 8, 1918, the Commission issued an order, or its "Tariff Circular No. 3," requiring all public utilities, including the Power Company, to file their tariffs or schedules of rates charged consumers. The order was complied with on the part of the Power Company, but its special contracts with

the Copper Company and others were not then filed. On October 23, 1918, the Commission issued a supplement to its said Tariff Circular No. 3 in which attention was called to the provisions of the Utilities Act, and particularly to section 4788, supra, providing that no public utility shall charge less or different compensation for any service rendered than that specified in the schedules filed, or any deviation therefrom, and further requiring all special contracts to be filed with the Commission. Thereupon the Power Company, in response to said order, filed with the Commission its special contracts, including its said contract with the Copper Company. After examination of the special contracts, in September, 1919, the Commission, pursuant to the Utilities Act, issued an order calling attention to the fact that the rates fixed in the special contracts of the Power Company with its consumers were not in harmony with the general rates charged consumers by the Power Company, that such rates appeared to be discriminatory and preferential, and in violation of the Utilities Act, and ordered that the said consumers show cause why the said special contract rates should not be held in contravention thereof. Said order initiated case known and designated as case No. 230 before the Commission. While said case No. 230 was pending before the Commission the Power Company, on December 4, 1919, filed its petition for a general increase and revision of its power rates, thus initiating before the Commission the case under consideration, designated case No. 248. Thereafter the two cases, Nos. 230 and 248, proceeded before the Commission concurrently, and the record made, by stipulation of the parties interested, was made as one case in so far as the facts were applicable. On October 18, 1920, the Commission decided case No. 230, finding that the special contracts under investigation in said case were discriminatory and preferential, and therefore in violation of the provisions of the Utilities Act. Thereupon the Commission ordered that the special contracts of the Power Company's consumers be modified to the extent that the "rates, rules and regulations prescribed in the standard schedules of the Power Company now on file with the Commission be, and they are hereby, ap-

plied to the service rendered to or for the said consumers in lieu of the rates, rules and regulations provided in said contracts; provided that 'the Power Company shall hold itself ready to make reparation, if any, as the Commission may order after its opinion and order in case No. 248 is issued.''

The special contract holders, including the Copper Company, thereupon applied for a rehearing before the Commission, and in response to the said petitions for rehearing the Commission made the following additional findings or order:

"That the rates set forth in the special contracts under consideration, wherein they are different from those set out in the regular schedule applicable to like service, are discriminatory and preferential.

"That the continuance in effect of these special discriminatory contract rates places an undue burden upon that part of the power consuming public that does not enjoy said special contract rates.

"That the published and filed schedules and tariffs of the Power Company now on file with this Commission purport to be, and by their terms are, applicable to the service rendered to the holders of the special contracts, and are the schedules which are open to and actually used by the public generally for similar service, and, unless and until changed, amended, superseded, or annulled by this Commission, should be applied to all service to which by their terms they are applicable.

"The foregoing findings are fundamental implications of the entire proceedings in this case, and are implied in the order of the Commission originally issued herein. This report is not intended to make any additional or new findings, but simply to clearly express the findings which were implied in the original report, and to indicate the Commission's attitude on some questions raised herein."

Thereafter case No. 230 was brought to this court for review upon a writ of certiorari. The rulings of the Commission were affirmed February 28, 1921. The petitioners, consumers under special contracts, filed a petition for rehearing, which was denied. In denying the said petition for rehearing this court said:

The question of whether the rates fixed by the Commission, and which it ordered the plaintiff aforesaid to pay, were just and reasonable, or whether they apply to any one or more, or all, of the plaintiffs, or whether, under the circumstances, the Commission had the power to make and enforce them, was not considered

and not decided." *U. S. Smelting & Refining Milling Co.* v. *Utah Power & Light Co.*, 58 Utah, 168, 197 Pac. 902.

Pending the hearing of the present case, No. 248, before the Commission, involving the right of the Power Company to increase rates to be charged its customers, we declined, and we think properly so, to pass upon the reasonableness of the rates sought to be charged by the Power Company, or to pass upon the temporary rates fixed by order of the Commission. We also refused, at that time, to express an opinion as to the power of the Commission, under the circumstances, to issue an order fixing and enforcing temporary rates   **1, 2** pending the hearing of the present case before the Commission.   Therefore the position taken by counsel for the Power Company, that our affirmance of the order of the Commission in case No. 230 in effect became res adjudicata as to these particular questions, is not tenable and cannot be sustained.

It is here, among other things, contended by the Copper Company that the rates charged power consumers according to the general or standard schedule of rates filed by the Power Company with the Commission in obedience to its said order or tariff circular No. 3, made and issued on the 8th day of April, 1918, was not applicable to it, and that, until the Commission had in the present case investigated and passed upon the justness and reasonableness of the rates to be charged consumers, the contract rate of January, 1913, between the Power Company and the Copper Company was the proper and the only rate that could be legally charged against it.   In short, the Copper Company, by its petition in the case, not only assails the temporary orders made by the Commission, but also questions its jurisdiction and the legality of its proceedings in general, and seeks to have all of its decisions and orders as to it reversed, canceled, annulled, and set aside.

As to the jurisdiction and powers of the Commission generally to regulate the public utilities of the state, and to fix the rates to be charged the public in accordance with our Utilities Act, regardless of contractual relations, we need not here comment.   These questions have already been considered and

determined by this court, as we think, in accordance with the legislative intent and the mandate of our state Constitution. *Salt Lake City* v. *Utah L. & T. Co.*, 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 715; *Union Portland Cement Co.* v. *Public Utilities Com.*, 56 Utah 175, 189 Pac. 593; *Murray City* v. *Utah L. & T. Co.*, 56 Utah 437, 191 Pac. 421; *U. S. S. R. & M. Co.* v. *Utah P. & L. Co.*, 58 Utah 168, 197 Pac. 902.

Primarily, then, the only questions before us for review and determination in the present case are: First. Had the Commission the power to fix a temporary rate and make it applicable to the service of the Copper Company after finding the contract rate was discriminatory and preferential and in conflict with section 4789, as it did do, before making its order of October 18, 1920, with the proviso that if such rate was ultimately found excessive the Power Company should stand ready to refund and make reparation? Second. If the Commission had the power, under the circumstances, to fix a temporary rate, was the ultimate rate found and fixed by the Commission's order of March 8, 1921, a just and reasonable rate as applied to the Copper Company service?

The Copper Company, in support of its position that the contract rate continued to be the lawful rate until changed by the order of the Commission last above referred to, has cited and relies upon the following authorities: *Ohio, etc., Co.* v. *Commission*, 68 Colo. 137, 187 Pac. 1082; *Timber Co.* v. *Ry. Co.*, 58 Wash. 604, 109 Pac. 320, 1020; *N. N. & M. V. Ry.* v. *Brick Co.*, 109 Ky. 408, 59 S. W. 332; *Martin* v. *Ry. Co.* (Iowa) P. U. R. 1917B, 883; *Manitowoc* v. *Traction Co.*, 145 Wis. 13, 129 N. W. 925, 140 Am. St. Rep. 1056; *Water Co.* v. *Commission*, 83 Wash. 130, 145 Pac. 215; *Portland Ry.* v. *Commission*, 56 Or. 468, 105 Pac. 709, 109 Pac. 273; *American Society* v. *Telephone Co.* (Wis.) P. U. R. 1917E, 215; *In re Rhinelander Power Co.* (Wis.) P. U. R. 1915A, 652; *In re Searsport W. Co.*, 118 Me. 382, 108 Atl. 452, P. U. R. 1920C, 347; *In re N. Y. Steam Co.* (N. Y.) P. U. R. 1918B, 866; *Superior* v. *Douglas County Tel. Co.*, 141 Wis. 363, 122 N. W. 1023.

These cases are not especially helpful in passing upon the questions involved in the case now before us. After a careful reading and due consideration of the cases 3 cited, and many others as well, in not a single instance do we find a contract rate upheld where the Commission, after investigation, found it to be discriminatory.

Fundamentally, the legislative or police power to regulate the public utilities of the state and fix rates rests upon the legal right to secure to the consuming public just, uniform, and equitable rates, as applied to the service rendered. In this connection it may also properly be said that the 4, 5 law contemplates that the serving utilities, burdened as they are and as they should be with the duty of rendering efficient service to the public, are entitled to earn a fair return or income from the property used in successful and economical operation.

It should be kept in mind that in the present case no attempt was made on the part of the Commission to set aside the contract rate until, after investigation, it found the rate to be discriminatory, and therefore illegal and in violation of the express provisions of the Utilities Act. As has been pointed out, this record shows that in April, 1918, the Commission issued its orders requiring the public utilities of the state, including electric utilities, to file with the Commission, before June, 1918, their schedules showing the rates, rules, and regulations affecting their service. That requirement of the Commission was complied with by the Power Company. Thereafter, October 23, 1918, the said utilities were, by a further order of the Commission, required to make known in writing within 10 days, among other things, any existing contracts with its customers which were not in accordance with the published schedules filed with the Commission. That order was also complied with by the Power Company, on November 23, 1918. The Commission then issued an order to the Power Company and its customers, there being several under such contracts, to show cause why they were not in contravention of the provisions of section 4789, supra, of the Utilities Act, as these contracts appeared upon their face,

when compared with the rates charged the consuming public generally, to be discriminatory and preferential. Afterwards, an exhaustive investigation and hearing was had before the Commission, in which the Copper Company appeared, participated, and took a prominent part. Every phase of the Power Company's business as a public service corporation, it appears, was gone into. Predicating its findings and conclusions that the contract rates between the Power Company and the Copper Company were discriminatory and preferential upon some 4,500 pages of testimony bearing upon both the contractual relations of the parties and the business of the Power Company as a whole, the Commission, on October 18, 1920, made and entered its order (effective October 22, 1920) that—

The "standard schedules of the Power Company now on file with the Commission be, and they are hereby, applied to the service rendered to or for the said consumers in lieu of the rates, rules, and regulations provided in said contracts; provided, that the Power Company should hold itself ready to make such reparation, if any, as the Commission may order after its opinion and order in case No. 248 [present case] is issued."

In making the regular schedule rates of the Power Company then on file with the Commission applicable to the Copper Company service, the Commission not only pointed out that the continuance in effect of the special contract rates would be casting on the consuming public an undue burden, but that such contract rates were annulled and superseded by the standard rates charged consumers generally.

It is obvious that the special contract rates, after being properly found discriminatory and preferential, could not be longer continued in violation of the express declaration of the Utilities Act that such were invalid. In other words, finding the contract rates to be discriminatory and preferential ended such rates. Therefore, under the circumstances, the only rates that could be made properly applicable to the Copper Company service by the order of the Commission were the regular or schedule rates charged consumers for like service, with provision that, if ultimately the schedule rates were found excessive, refunds of the excess

should be made by the Power Company.  Section 4788, supra; *Boston, etc., R. Co.* v. *Hooker*, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593; *Louisville, etc., R. Co.* v. *Maxwell*, 237 U. S. 94, 35 Sup. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E, 665; *Louisville, etc., R. Co.* v. *Dickerson* (C. C. A. 6th Cir. 1911) 191 Fed. 705, 112 C. C. A. 295; *Poor Grain Co.* v. *C. B. & Q. R. R. Co.*, 12 Interst. Com. R. 418; *State* v. *Billings Gas Co.*, 55 Mont. 102, 173 Pac. 799; *Suburban Water Co.* v. *Borough of Oakmont*, 268 Pa. 243, 110 Atl. 778; *T. & P. Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; *Kinnavey* v. *Terminal R. Co.* (C. C.) 81 Fed. 802; *F. S. & W. R. Co.* v. *State*, 25 Okl. 866, 108 Pac. 407; *Muskogee G. & E. Co.* v. *State* (Okl.) 186 Pac. 730; *O. & C. B. Street Ry. Co.* v. *Neb. State R. Com.*, 103 Neb. 695, 173 N. W. 690, P. U. R. 1919F, 307.

Section 4788, supra, of our Utilities Act is analogous to the provisions of the Interstate Commerce Act.  See paragraph 7, § 6, "Act to Regulate Commerce," as amended by act of June 29, 1906 (chapter 3591, § 2; 34 Stat. L. 587 [U. S. Comp. St. § 8569]).  The federal courts, in construing the provisions of the Interstate Commerce Act have invariably held that the effect of filing rate schedules is to make the published rates the only lawful rates and all alike must abide by them until modified, vacated and set aside by the Commission.

In *Louisville, etc., R. Co.* v. *Dickerson*, supra, it was held by the United States Circuit Court of Appeals, Sixth Circuit:

"The cardinal purpose of the provisions for the public establishment of tariff rates is to secure uniformity, reasonableness, and certainty of charges. for services.  A rate once regularly published is no longer merely the rate imposed by the carrier, but becomes the rate imposed by law; and routes and rates once so established become matter of public right and forbid private contract inconsistent therewith.  It results that, under the Commerce Act, a stipulation in a bill of lading for a rate greater or less than the published tariff is void."

In *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, supra, the late Chief Justice White said:

"There is not only a relation, but indissoluble unity, between

the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibitions against preferences and discrimination. This follows, because unless the requirement of a uniform standard of rates be complied with it would result that violations of the statute as to preferences and discriminations would inevitably follow. This is clearly so, for if it be that the standard of rates fixed in the mode provided by the statute could be treated on the complaint of a shipper by a court and jury as unreasonable, without reference to prior action by the Commission, finding the established rate to be unreasonable and ordering the carrier to desist in the future from violating the act, it would come to pass that a shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of the Court and jury, and thus such shipper would receive a preference or discrimination not enjoyed by those against whom the schedule of rates was continued to be enforced."

Let it be kept in mind that the Commission did not by its order directing the contract rate to be superseded by the schedule rates determine or adopt the latter rates as being just and reasonable as applied to the service rendered its consumers, including the Copper Company, pending investigation as to whether such rates were just and reasonable. All it did do by its order was to require, pending the ultimate determination of the question as to the justness and reasonableness of the scheduled rates, that the Copper Company should not be permitted to enjoy a contract rate clearly found to be discriminatory and preferential as against the consuming public generally. That order, as made, was, in our judgment, not only in accord with the plain provisions of our Utilities Act, but in perfect harmony with the principles of justice, and every well-considered case that has been passed upon by the courts where the question had been raised under similar circumstances.

Counsel for the Copper Company, with commendable zeal, points out and contends that the scheduled rates were over 100 per cent. higher than the contract rates; that the schedule rates were being assailed as being unjust and unreasonable as applied to the Copper Company service; that the reasonableness of the schedule rates should have been first determined

by the Commission, and that the effect of the Commission's order as made is retroactive.

As before pointed out, the requirements of our Utilities Act are such that a public utility may not, by any device, whether by contract or otherwise, deviate from the regular rates charged under its published schedule. Any contract rates, whether higher or lower than the schedule rates, are expressly declared to be invalid, and the schedule rates are the only rates that can be recognized and applied pending an investigation and determination by the Commission. If that be true, then, pending an investigation of the reasonableness of the schedule rates, it was proper and right for the Commission under the circumstances to make its order temporary only, and in the manner and form it did make it. *Suburban Water Co.* v. *Borough of Oakmont,* supra; *Ft. Smith & W. R. Co.* v. *State,* supra; *Muskogee G. & E. Co.* v. *State,* supra; *Omaha & C. B. Street R. Co.* v. *Nebraska State R. Com.,* supra.

In the case of *Suburban Water Co.* v. *Borough of Oakmont,* supra, where the precise question now under consideration was raised, the Supreme Court of Pennsylvania said:

"While the investigation as to reasonableness of a rate under complaint is pending, 'the rate to be charged * * * is the one fixed and published in the manner pointed out in the statute and subject to change in the only way open by the statute.' *Armour Packing Co.* v. *U. S.,* supra. It is the effective, collectible, and suable rate duly published as required by the act, and remains as such, governing the charges to be made pending the investigation until the Commission 'shall determine, and prescribe by a specific order, the maximum, just, due, equal, and reasonable rate * * * to be thereafter established, demanded, exacted, charged or collected.' Section 3, art. 5, supra. It is at this point on petition for reparation, that any injustice done to consumers, pending investigation, may be worked out; but the proceeding throughout the act in this respect deals with the subject of rates, and its allied practices and regulations. It does not deal with contracts."

Under the circumstances disclosed by this record, we are of the opinion that the temporary order of the Commission, making the filed and published schedule of rates then before it the rates applicable to the Copper Company service, was the right

one, and the only lawful order that could be made pending a hearing and an ultimate determination of the reasonableness of the Power Company rates as applied to the class of consumers to which the Copper Company belonged.

This brings us to the question, Was the ultimate rate fixed by the Commission's order of March 8, 1921, just and reasonable, and properly found to apply to the Copper Company service?

At this juncture it may be well to first consider to what extent this court has jurisdiction to review the findings and orders of a purely legislative administrative board or commission, such as our Utilities Commission is conceded to be.

Section 4834 of the Utilities Act provides:

" * * * The review shall not be extended further than to determine whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the state of Utah. The findings and conclusions of the Commission on questions of fact shall be final and shall not be subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the Commission on reasonableness and discrimination. The Commission and each party to the action or proceeding before the Commission shall have the right to appear in the review proceedings. Upon the hearing the Supreme Court shall enter judgment either affirming or setting aside the order or decision of the Commission."

The foregoing provision of the Utilities Act must be read and construed in the light of section 11 of article 1 of our Constitution, which reads:

"All courts shall be open, and every person, for an injury done to him in his person, property, or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay."

In the case of *Salt Lake City* v. *Utah L. & T. Co.*, supra, in which our jurisdiction as a reviewing court in this class of cases was passed upon, we said:

"For the reasons hereinafter stated it will appear that we do not possess the power to review the Commission's findings in respect of whether a certain rate is reasonable or otherwise. * * * After a careful examination of the authorities [cited] we are

more than ever confirmed in the opinion that all that we can
review in cases of this kind is whether there is any evidence
to sustain the findings of the Commission, whether it has exer-
cised its authority according to law, and whether any constitu-
tional rights of the complaining party have been invaded or dis-
regarded."

Speaking of the foregoing constitutional provision, it was
said:

"It is not meant thereby that this court may reach out and
usurp powers which belong to another independent and co-ordi-
nate branch of the state government.  The power conferred upon
the Legislature is supreme respecting the regulation and estab-
lishing of rates.  We may not interfere with or review any legis-
lative act unless some judicial question is presented for review.
Unless a rate established by the Commission is clearly oppressive
on the one hand or confiscatory on the other, no judicial question
is presented.  So far, therefore, as the questions are judicial, the
Utilities Act has conferred power upon this court, and, in so
far as the acts of the Commission are properly administrative,
or in their nature legislative, the power has been wisely and
properly withheld 'from us.  Whether there is any substantial
evidence to support any finding of fact that the Commission may
make is a judicial question, and may be determined by this court.
*  *  *  The parties also differ with respect to the amount in-
vested, and what would amount to a reasonable return on the in-
vestments.  The Commission has, however, fully considered and
passed on those questions.  Since we are powerless to review the
findings of the Commission in that respect, it is of no consequence
what conclusion the writer, or, for that matter, this court, might
arrive at upon those questions."

It will be seen from the foregoing that this court stands
committed to the doctrine that our Utilities Commission is
purely an administrative body, clothed by the Legislature
with the power to regulate the public utilities of this state,
and that we, as a court, have no right to interfere with the
functioning of the Commission until it clearly appears
that the rates as established by it are manifestly unjust        7
or confiscatory in their nature.  The case at bar is
somewhat peculiar in some of its aspects.  Ordinarily, before
a rate is established, the Commission takes into consideration
what would be a fair return upon the reasonable value of the
utilities property devoted to a public use.  For the purpose

of ascertaining the present value of the property so employed different theories have been adopted, such as examination into the original cost of the plants, cost of their reproduction, their present value, and the outstanding capitalization of the utility. Pond, Public Utilities, § 477.

In this instance the Commission singled out what is conceded to be the most complete and up-to-date plants of the Power Company, viz. the Bear River plants, thoroughly investigated them, and, after doing so, predicated the rates found by it to be just and reasonable upon these plants. In doing that, if the ultimate rate found by the Commission is just and reasonable, as applied to all consumers alike, certainly the Copper Company has no just cause to complain of the rate fixed as being confiscatory in its nature. While the Power Company endeavored to make a showing before the Commission of its total investment in its entire system, with a view of having the rates fixed accordingly, the Commission in determining the rates here complained of confined its investigations largely to the Bear River plants, and, upon the showing made as to them, and the present needs of the Copper Company, formulated the present rate basis.

It appears that, not only is there substantial evidence in this record to support the findings of the Commission as made, but the great weight of the evidence is to the effect that, if the Power Company was to be permitted to exist as a public utility, and render efficient service to the consuming public, then, temporarily at least, it was necessary that the rates established by the Commission be practically maintained. Considerable evidence was received before the Commission as to the relative worth of hydroelectric and steam generating plants. At most, there was a disagreement or conflict in testimony of experts in this regard, and there is substantial testimony in the record to show that the cost of generating electrical power by means of these plants does not materially differ.

Under the circumstances, we find that the Commission acted regularly, and within the powers conferred upon it by the Legislature, in ordering the contract rates superseded by the

regular schedule rates.  Further, we are of the opinion that
the contention made by the Copper Company that the schedule
rates are unjust and confiscatory as applied to its service has
not been sustained.  Aside from that, and especially as to
whether the schedule rates are too high or too low, we express
no opinion.  In either event that is a matter to be determined
by the Commission alone.  Until the Commission has acted
outside its powers, or until it clearly appears that the rates
fixed by it are unreasonable or confiscatory in their effect, we
have no right to interfere.

Therefore, for the reasons stated, we think the rulings and
orders of the Commission should be, and the same are hereby,
affirmed, with costs.

In this case after the Utah Copper Company alone had
brought its case to this court for review within the time and
in the manner as by statute provided, in which an interested
party who is dissatisfied with a decision of the Commission
may do so, certain consumers of power under contract with
the Power Company, viz. the Bamberger Electric Railroad
Company, Utah-Idaho Central Railroad Company, and the
Holley Milling Company, who had not joined with the Utah
Copper Company nor taken any steps whatever in the pro-
ceedings for review before this court, asked leave and were
granted permission to file briefs and arguments herein con-
cerning the questions involved.  Subsequent to their filing
briefs in accordance with the permission granted by this
court, they presented petitions and entries of appearance in
the case as brought on for review by the Copper Company,
and have sought to have this court treat them in the light that
they are interested parties before the court.  As to them it
must be sufficient to say that they have not in any manner
complied with the plain, clear, and express provisions of the
statutes controlling the rights of interested parties to have the
rulings of the Commission reviewed and passed upon by this
court, and therefore their untimely petitions and appearances
should not be permitted, and must be, and are denied.

THURMAN, J., concurs.

FRICK, J. (concurring).  I concur in all that the Chief Justice has said in his opinion.  In view of the peculiar circumstances of this case, I feel constrained, however, to add a few words to what is said in the opinion of the Chief Justice.

This case was pending before the Commission for many months.  An immense mass of evidence was produced before it upon the points in dispute.  The Commission has made findings upon the disputed questions of fact, and, in so far as they are supported by substantial evidence, this court, as a matter of course, is powerless to interfere with those findings.

One of the points that has been vigorously argued is that the Commission acted prematurely in adopting the rate drawn in question in this proceeding, in that it had not first adopted a reasonable rate, but had merely adopted the schedule of rates filed by the Power Company with the Commission as it was requested to do.  The Chief Justice has fully answered that contention.  I desire to add, however, that what the Commission did was to adopt the schedule of rates, as it had a right to do, as temporary or tentative rates, and after it had fully investigated into their reasonableness, and not before, it established the rates contained in the schedule aforesaid.  In doing that the Commission not only did not violate any of the provisions of the statute, but it substantially complied with all of the statutory provisions upon that subject.

It is suggested, however, that after the case was submitted the Copper Company and the Power Company adjusted their differences, and hence this case must fail.  This is not an appeal where the appellant may dismiss his appeal at will.  It is an original proceeding in this court to which the Commission is a party, and, under our statute, is always a proper, if not an indispensable, party.  The Commission, under Comp. Laws Utah 1917, § 4834, has precisely the same rights that any other party has to the proceeding, and this court cannot, without the consent of the Commission, dismiss it out of court. The mere fact, if it be a fact—and absolutely nothing appears upon the records of this court that it is a fact—that some of the parties have adjusted their differences as to the rates, in

Certiorari.   Orders affirmed

no way affects the proceedings as to the Commission or other parties thereto, although the parties who have adjusted their differences may have given rise to the proceeding.   This is so because every proceeding under the Utilities Act at some point and to some extent affects the public interests.   To illustrate:   In this case, as we have seen, it is strenuously contended that the Commission exceeded its power in considering the schedule of rates for any purpose; that it was its duty to determine for itself what rates were reasonable, and unless and until such rates were actually established by the Commission it was powerless to change or interfere with the rates agreed upon by the consumer and the Power Company. That contention, however, is held not to be tenable by the Chief Justice for the reasons by him stated.   Now, it so happens that the legality of the action of the Commission relating to the schedule of rates, as before stated, affects not only many others who are furnished electrical energy by the Power Company for both power and lighting purposes, but also to a large extent affects the public interests.   All those interests, as well as the Commission, are therefore directly interested in knowing whether the acts and conclusions of the Commission relating to the schedule of rates as filed by the Power Company are legal or illegal, or whether the Commission had exceeded its powers in that regard.   In view, therefore, that this controversy is not merely a private one, and that the Commission, as well as the public, are directly interested in knowing whether the acts of the Commission are legal, and may be followed hereafter or not, it is quite as important and necessary for this opinion to be handed down at this time as it would be if the two parties had not adjusted their differences. Further, in order not to waste the many months of time of the Commission in determining the facts with respect to the reasonableness of the rate in the schedule of rates aforesaid, it is important that the case be now disposed of.

I am firmly of the opinion, therefore, that this opinion should be filed and, further, that the conclusions reached by the Chief Justice are correct.

GIDEON, J. (dissenting in part). As pointed out in the foregoing opinion of the Chief Justice, this court, in *U. S. Smelting R. & M. Co.* v. *Utah P. & L. Co.*, 58 Utah 168, 197 Pac. 902, concluded, and so held, that the Public Utilities Law gave jurisdiction to the Commission over contracts entered into by public utilities prior to the enactment of that law; also, if such contracts are found to be preferential or discriminatory, to make the necessary investigation and determine the rate to be paid for the services covered by the contracts. In this case the sole query is whether the Commission, having determined that the contract rate was discriminatory as compared with the rates charged the general public, can, without further investigation, order a new or temporary rate to be enforced during the time necessary to enable the Commission to make a sufficient investigation to determine a reasonable rate for the services covered by the contract in question. It is one thing to determine that a contract rate is discriminatory when compared with what the general public is paying, and quite another and different thing to determine whether a rate is discriminatory when ascertaining the rate a public utility is entitled to charge. It might well be that the rate fixed in the contract would be found not to be discriminatory or preferential, but that the discrimination existed in the rate charged the general public. The history of the development and gradual substitution of electrical energy in the industries of this country, and by the municipalities in public lighting, warrants the conclusion that it was the thought of the Legislature that the descending scale of the cost of producing that energy would continue rather than cease, and the scale begin to ascend. New methods and inventions tending to reduce the cost of producing this power had followed each other with ever-increasing regularity, until it had become fixed in the mind of the public that such decreasing cost would continue. The law was enacted by the Legislature with such facts as the controlling reason for any legislation on the subject. I have never thought, nor do I now think, that it was the intent of the Legislature to relieve a utility from the legal effects of bad financiering or from the

result of disadvantageous contracts made by it. The primary intent was to see that the public and every one received fair treatment, and should have the benefit of the reduced cost of production.

In the very nature of things, some investigation is contemplated and necessary before a commission, court, or any one, can determine a rate to be discriminatory against a utility. In this case no claim is made that any facts were ascertained upon which to base and determine a reasonable or fair rate prior to the order made in October, 1920, save a tariff schedule prepared by the utility itself (the Power Company). It should be kept in mind that no emergency or urgent need existed on the part of the utility for an increase in rate. No receivership was threatening the utility, as was the fact in many of the cases cited. The opening statement, found in the record, by counsel for the Power Company at the beginning of the hearing before the Commission negatives any such claim. We have therefore this situation: A valid contract existing between the parties prior to the enactment of the Public Utilities Law, a contract admittedly binding and enforceable between the parties except for the intervention of that law. That act was held by this court to be an assertion of the police power reserved to the state for the public good, and entering into and becoming a part of all contracts made with a public utility, whether made before or after the law became effective. The act undertakes to, and does, give to the Commission the power to investigate and from the facts ascertained fix by order the rate to be charged by the utility. Under the facts shown by this record, it would seem to be a reasonable and fair construction of the statute to hold that the state had done its full duty to a public utility by relieving it from the burden of a rate fixed in a solemn contract only after an investigation sufficiently thorough to intelligently and with a reasonable degree of certainty determine the rate the utility is entitled to charge for the services rendered. Such construction has the further merit of regularity to support it. In that way the Commission leaves the parties just where they placed themselves by a voluntary contract until

such time as the facts have been ascertained upon which to base a determination of what the rates should be. That is all that plaintiff is asking in this proceeding. The defendant Power Company, the utility involved in this litigation, was organized as a corporation in the year 1912. The record before this court is full of testimony tending to establish the fact that during the period of organization and of financing the enterprise its officers and agents were diligent in attendance in the anterooms of plaintiff and other consumers of electrical energy, as well as the outer rooms of municipal council chambers, soliciting the privilege of furnishing electrical energy for the rates stipulated in the contracts now abrogated by order of the Commission. There is little dispute that by virtue of these contracts the utility was enabled to finance its enterprise. By reason of these facts, and others appearing in this record, it can, at least with some degree of plausibility, be said that this utility feels that it has the right to make a practical application of the scriptural admonition, ''Ask, and it shall be given you; * * * knock, and it shall be opened unto you.''

At the time case known as No. 230 was first brought to this court I entertained serious doubts as to the state's power to give to the Commission authority to inquire into existing contracts, and by order determine a different rate to that provided in the contract. The authorities, I am now convinced, amply support the right of the state to assert its power respecting the rate to be charged by a public utility for any service rendered by such utility regardless of prior contracts. Not only do the authorities support that conclusion, but it is, in my judgment, in the interest of sound public policy that such rights should always remain in the sovereign. But what I do doubt, however, is the wisdom or the necessity, under the facts shown in this voluminous record, during this period of reconstruction, of the Commission's policy in concluding that its duty required it to fix a rate to be charged by this utility so as to guarantee a fixed income of 8 per cent. on the investment. That order could well have been left to a later date, at a time when the economic conditions had become more

nearly normal.   Investors in other industries are compelled to await incomes on investments, and I do not find anything in this record to support the claim that the public interest would suffer if a different policy had been adopted by the Commission.

In my judgment, the Commission went beyond the intent of the Legislature in making its order of March, 1921, retroactive to take effect at a date prior to the order or finding determining the rate the utility should receive for the services covered by the contract.   I therefore withhold my approval from that part of the Commission's ruling making its order of March, 1921, effective in October, 1920.   I concur in the court's order denying to the Holley Milling Company and others the right to become parties to this review.

WEBER, J.   I concur with Justice GIDEON.   I further think that no decision should be rendered in this case, because there is at this time no real controversy between the parties, as the record of the Public Utilities Commission shows that the Copper and Power Companies have adjusted their differences, with the approval of the Commission.